ALVARADO PARTNERS, L.P., on Behalf of Itself and All Others Similarly Situated, Plaintiff,

v.

Rajiv P. MEHTA, John A. Hoxmeier, James E. Brownhill, Robert A. Rademacher, Charles F. Smith, and 3CI Incorporated; and Hanifen Imhoff Inc., Individually and as Representative of a Defendant Class, Defendants.

HANIFEN IMHOFF, INC., Third–Party Plaintiff,

v.

DELOITTE, HASKINS & SELLS, Third–Party Defendant.

Civ. A. No. 88–B–781.

United States District Court, D. Colorado.

Sept. 15, 1989.

John E. Grasberger, Frederic F. Nagel III, Milberg Weiss Bershad Specthrie & Lerach, San Diego, Cal., Jay S. Horowitz, Horowitz & Berrett, P.C., Denver, Colo., for plaintiff.

Robert F. Hill, Hill & Robinson, P.C., Denver, Colo., Gary Bendinger, Giauque, William, Wilcox & Bendinger, Salt Lake City, Utah, for Deloitte, Haskins & Sells.

David Palmer, Gregory J. Kerwin, Gibson, Dunn & Crutcher, Denver, Colo., for Mehta, Hoxmeier and 3CI.

David J. Richman, Coghill & Goodspeed, P.C., Denver, Colo., for Hanifen Imhoff, Inc.

Miles C. Cortez, Jr., Cortez & Friedman, P.C., Denver, Colo., for Brownhill, Rademacher and Smith.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this federal securities class action, hearing was held on August 15, 1989 on plaintiff's, Alvarado Partners, L.P. (Alvarado) and defendants' Rajiv P. Mehta, John Hoxmeier, James E. Brownhill, Robert A. Rademacher, Charles F. Smith, and 3CI Incorporated (3CI) (collectively known as settling defendants) motions for 1) entry of a good faith order pursuant to Fed.R.Civ.P.

23(e) and 2) orders approving partial settlement and plan for distribution.

The motions present, *inter alia*, the issue, previously unaddressed in the 10th Circuit, of whether, and under what circumstances, a settlement between plaintiff and fewer than all defendants (partial settlement) may operate to bar the non-settling defendants' express and implied rights of contribution under the federal securities laws and if so, the form of the bar. In ruling on the motions, I determine that:

1. this is a proper case for conditional certification of a settlement class;
2. pursuant to Fed.R.Civ.P. 23(e), the settlement is fair, adequate, and in the best interests of the plaintiff class;
3. there is no right to indemnification in a federal securities action;
4. there is an express right to contribution under § 11 of the 1933 Securities Act;
5. under the 1934 Exchange Act there is an implied right to contribution under § 10(b) and Securities and Exchange Commission Rule 10b–5;
6. a bar to contribution is available under federal law; and
7. the offset under the settlement contribution bar is determined by applying the proportionate rule.

### JURISDICTION AND VENUE

Alvarado brings this action pursuant to Sections 11, 12(2), and 15 of the Securities Act of 1933 (Securities Act) [15 U.S.C. §§ 77k, 77*l* (2), 77*o* ], Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. §§ 78j(b), 78t(a) ], and Rule 10b–5 promulgated thereunder by the United States Securities and Exchange Commission (SEC). Jurisdiction exists pursuant to Section 22 of the 1933 Act [15 U.S.C. § 77v] and Section 27 of the 1934 Act [15 U.S.C. § 78aa].

### PROCEDURAL AND FACTUAL BACKGROUND

This multi-party securities violation class action is brought by purchasers of stock in 3CI Incorporation, a company which designs, develops, and markets computer software. For the purpose of this ruling only, I glean from the parties' pleadings the following facts.

3CI is a public corporation which, as of February 1987, had approximately 1.1 million shares outstanding that were traded in the national over-the-counter market. Hanifen Imhoff, Inc. (Hanifen), a registered broker-dealer under the Exchange Act, was the principal and managing underwriter for the March 1987 offering. As lead underwriter, Hanifen conducted "due diligence" investigations into the business operations, internal accounting, operation, and management systems of 3CI. As 3CI's auditors and accountants, Deloitte, Haskins & Sells (DHS) reviewed audited and unaudited financial statements prepared by 3CI.

On February 24, 1987, 3CI, seeking an infusion of capital into the company, filed a preliminary prospectus for the sale of additional shares to the public. The preliminary prospectus allegedly contained false and misleading statements which operated to inflate artificially the price of the 3CI stock. These statements included representations that revenues and income from 3CI's principal product had consistently increased during the previous two years and nine months and that the number of licenses and contracts of 3CI's software packages was growing rapidly. The preliminary prospectus also represented that, pursuant to DHS's reviews, 3CI's financial statements were in conformity with generally accepted accounting principles and that 3CI's method of recognizing revenues was proper. The registration statement and prospectus containing the alleged false and misleading statements were filed with the SEC on March 18, 1987. Between the filing dates of the preliminary prospectus and the registration statement and prospectus, 3CI management and Hanifen made presentations to prospective investors based on these optimistic earnings statements and projections. Also, on March 18, 1987, DHS wrote to Hanifen a so-called "comfort letter" and amendment dated March 27,

1987. In it, DHS opined that 3CI's financial statements and accounting procedures were proper and that the registration statement complied as to form in all material respects with the accounting requirements of the Securities Act and Exchange Act and published rules and regulations thereunder.

Based on investor reaction to the positive information in the preliminary prospectus and the presentations, defendants were able to increase the number of shares to be registered in the public offering and to increase the per-share price by approximately $0.75 per share. At the time of the preliminary prospectus, the market price of 3CI's then outstanding stock was approximately $7.00 per share while the offering price was $7.75 per share.

The registration statement and prospectus became final on March 18, 1987. All of the newly-registered shares, 1.15 million shares plus an over-allotment of 172,500 shares, were then sold. Of the approximately 1.3 million shares sold, 1.1 million were sold by 3CI and 200,000 shares were sold by two inside directors, defendants Mehta and Hoxmeier. The shares sold for $7.75 each. This represented revenues of more than $10 million, of which approximately $8.6 million went to 3CI, $1.3 million to Mehta and $200,000 to Hoxmeier. Out of these amounts, Hanifen received fees of approximately $350,000 for marketing the issue. Following the public offering, Hanifen, pursuant to its undertakings in connection with the underwriting, supported the market for 3CI stock allegedly resulting in a loss of $500,000 to Hanifen.

Allegedly, not only were the projections of future revenues and earnings incorrect, but past revenues and income had been over-stated. In July, 1987 3CI announced that, notwithstanding the information in its prospectus, it expected to report a loss for the quarter ended March 31, 1987, and that it might report a loss for the entire fiscal year. Several days later, 3CI made other public disclosures, including that:

> (a) according to its independent auditor, third-party defendant DHS, 3CI's financial statements had NOT been prepared in accordance with generally accepted accounting procedures; and
>
> (b) not only would revenue and income not double each year, but for the fiscal year just ended, 3CI was reporting a loss of 19 cents per share, as compared to a profit of 34 cents per share the prior year.

After this news, the price of the 3CI stock plummeted. During the class period (February 24, 1987, the date of the preliminary prospectus, to July 30, 1987, the date of announcement of business problems), 3CI stock sold for $6—$8 per share. After these unfavorable announcements, in one month the price of 3CI shares dropped to below $4 per share. By the end of July 1989, 3CI stock sold for less than $1 per share.

On May 23, 1988, Alvarado filed this action against settling defendants and Hanifen on behalf of all persons who purchased 3CI common stock during the class period. Hanifen answered and filed the following cross-claims:

1. contractual indemnity pursuant to its underwriting agreement against 3CI, Mehta and Hoxmeier;

2. breach of warranty and breach of contract against 3CI, Mehta, and Hoxmeier arising out of the parties' underwriting agreement;

3. contractual contribution against 3CI, Mehta, and Hoxmeier arising out of the underwriting agreement;

4. contribution under §§ 11(a) and 11(f) of the Securities Act and contribution under § 10(b) of the Exchange Act or Rule 10(b)(5) of the SEC regulations against all crossclaim defendants;

5. fraud against all crossclaim defendants;

6. negligent misrepresentation against all cross-claim defendants.

Thereafter, as third-party plaintiff, Hanifen filed a complaint against third-party defendant DHS.

On May 31, 1989 Alvarado entered into a settlement agreement with settling defendants. On June 1, 1989, Alvarado and settling defendants filed a joint motion re-

questing class certification for settlement purposes.

The terms of the proposed settlement include:

1. cash payment of $350,000 including $250,000 to be paid by 3CI and $100,000 to be paid by the inside directors Mehta and Hoxmeier;

2. issuance of $1.0 million worth of 3CI common stock, to be valued by averaging the closing price of the stock during a two-week period ending several days before distribution, with the maximum number of shares capped at 1.5 million;

3. reformation of Mehta's employment contract, reducing his salary from $125,000 to $90,000 and removing him from day-to-day management of 3CI;

4. full cooperation by 3CI and all of its directors in the ongoing prosecution of this case;

5. provisions for any class member to opt out in the manner set forth in the settlement notice;

6. provision for plaintiff to seek here an order extinguishing any rights, claims, or causes of action by the non-settling defendants against the settling defendants which arise out of, are based upon, or are otherwise related to the settled claims, including but not limited to claims for contribution and/or indemnification;

7. provision allowing any condition to the effectiveness of the settlement to be waived;

8. in the event of a failure of any of the conditions which are not waived, the settlement agreement fails.

On June 5, 1989, I entered a Fed.R.Civ.P. 23 order certifying a settlement class for the limited purpose of effecting the partial settlement. As conditionally certified, the class was defined as:

all persons (other than defendants, members of the immediate families of the individual defendants, and the legal representatives, heirs, successors, or assigns of any defendant) who purchased the common stock of 3CI Incorporated during the period of February 24, 1987 through and including July 30, 1987 and who sustained damages as a result of such purchases.

The order also provided for form of notice and set a hearing for approval of the proposed partial settlement and plan of distribution.

On August 15, 1989 I heard oral argument on Alvarado's and settling defendants' Fed.R.Civ.P. 23(e) motion. For the sake of expediency, at the same hearing I took argument on the question whether to allow a contribution bar, and if a bar were allowed, the form of offset applicable against any liability assessed against non-settling defendants.

## I. CONDITIONAL CERTIFICATION OF SETTLEMENT CLASS

■ The propriety of conditional certification of a class for settlement purposes before a formal Fed.R.Civ.P. Rule 23 inquiry has not been addressed by the 10th Circuit Court of Appeals. Hence, I set forth my reasons for certification of the settlement class here.

In the past, the creation of settlement classes before certification was disfavored. Courts voiced concern that the practice might be "inconsistent with the requirement [of Rule 23] that certification as a class action be determined 'as soon as practicable after the commencement of the action.'" *In re Franklin Nat'l Bank Securities Litig.*, 574 F.2d 662, *modified*, 599 F.2d 1109 (2nd Cir.1978). Commentators argued that this practice could foster collusion or improper pressure by defendants and, thus, recommended a firm prophylactic rule prohibiting the formation of settlement classes. *Manual for Complex Litigation*, § 1.46 (1977). However, as the volume and complexity of class actions increased, courts realized that such a blanket rule unduly inhibited settlement of class issues before class certification. *In re Beef Indus. Antitrust Litig.*, 607 F.2d 167 (5th Cir.1979), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). The hallmark of Rule 23 is its flexibility to

utilize class actions to best serve the ends of justice and to promote judicial efficiencies. *Id.* Also, Fed.R.Civ.P. 23 does not forbid the formation of such classes. Consequently, many jurisdictions now authorize settlement classes. *See e.g. Weinberger v. Kendrick,* 698 F.2d 61 (2nd Cir. 1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *In re Beef Indus., supra; In re First Commodity Corp. of Boston Custom Accounts Litig.,* 119 F.R.D. 301 (D.Mass.1987); *Girsh v. Jepson,* 521 F.2d 153 (3rd Cir.1975). Indeed, the current *Manual for Complex Litigation,* 2nd Ed. § 30.45 (1985) recognizes the use of settlement classes citing such benefits as early settlement, reduced attorney fees, reduced costs which might have been spent in contesting Rule 23 certification, and concomitant increase of settlement funds, *Id.* at § 30.45. For these reasons, I hold that conditional class certification for settlement purposes may be ordered in an appropriate case.

 In determining the propriety of certifying a settlement class, courts weigh its benefits and risks. Contrary to the above mentioned benefits, risks include the difficulty in early assessment of the fairness of a settlement. Moreover, crucial information may be lacking, including the number of members in the class, the size of their potential claims, the strengths and weaknesses of the parties' positions, and the class members' benefit under the settlement.

In a securities fraud class action, however, unlike, for example, a products liability class action, the size of the class can be fairly estimated through stock registration information. In addition, it is not difficult to assess the total amount of the potential claims, capped by the number and price of shares sold during the class period.

Here, notices were sent to approximately 1,300 shareholders. The class period is short running from February 24, 1987 through July 30, 1987. Approximately 1.3 million shares were sold during this class period for approximately $10 million.

In balancing the relative risks and benefits of conditionally certifying a settlement class, in light of the precise information available about the class and its claims, I find and conclude that this case is a proper one for conditional certification as a settlement class.

## II. FED.R.CIV.P. 23(e) SETTLEMENT APPROVAL

Fed.R.Civ.P. 23(e) provides:

**Dismissal or Compromise.** A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

 The authority to approve a settlement of a class is in the sound discretion of the trial court. *Jones v. Nuclear Pharmacy, Inc.,* 741 F.2d 322 (10th Cir.1984). A class action settlement must be found to be fair, adequate and reasonable to the class as a whole. *Jones, supra.* In making this determination, the trial court should consider:

1. whether the proposed settlement was fairly and honestly negotiated;

2. whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

3. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and

4. the judgment of the parties that the settlement is fair and reasonable.

*Jones, supra; In re New Mexico Natural Gas Antitrust Litig.,* 607 F.Supp. 1491 (D.Colo.1984).

 The primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations. *In re New Mexico Natural Gas, id.* citing, *inter alia, Collins v. Thompson,* 679 F.2d 168 (9th Cir.1982). Also, where as here, there has been conditional certification of a class for settlement purposes, the duty of the Court is heightened to meet concerns of collusion or undue pressure by the settling defendants on

would-be class representatives. In such a situation, there must be a "clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of the negotiations leading to the settlement." *Weinberger v. Kendrick, supra* at 73.

■ Here, notice was given pursuant to my June 5, 1989 order. It required that Alvarado's counsel mail a copy of the settlement notice to every name and address appearing on the class mailing list and publish summary notice in the national edition of the *Wall Street Journal* on or about June 13, 1989. On August 16, 1989 a "declaration re: mailing of class notice and proof of claim forms and publication of summary notice" was filed. It stated that the notice provisions had been met. The declaration shows that adequate notice was timely and sufficiently given to class members in full compliance with requirements of due process, Fed.R.Civ.P. 23(e), and my order.

Accordingly, I find that class members have been adequately and fairly notified of: (1) the terms of the partial settlement agreement; (2) the date, time and place of the hearing on applications for approval of the proposed partial settlement and plan of distribution; and (3) the procedure to comment on, and object to, the partial settlement.

### A. Application of Rule 23(e) factors

#### 1. Nature of partial settlement negotiations

■ The first question to be answered in determining whether the partial settlement is fair, reasonable, and adequate is whether the negotiations were fairly and honestly conducted. I find that the negotiations were conducted at arms length and were fairly and honestly negotiated.

Here, the settling parties are represented by competent, seasoned attorneys who have conducted this litigation with professionalism and vigor. Settlement discussions took the form of telephone calls, letters, and status conferences, during some of which the magistrate urged settlement. Moreover, the magistrate received copies

of all settlement letters between the parties. The non-settling defendants had opportunity to participate in all settlement negotiations but chose not to. No party has raised the specter of collusion or improper pressure.

#### 2. Strength of opposing positions

The next factor to be evaluated is whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt. In this case, limited discovery has been conducted because the partial settlement was reached relatively early in the course of litigation. Therefore, the Court is unable to assess adequately this factor.

#### 3. Expense, complexity and duration of litigation

The third factor is whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation. On balance, I find that the value of an immediate recovery outweighs the mere possibility of future relief.

It has been held prudent to take "a bird in the hand instead of a prospective flock in the bush." *State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740 (S.D.N.Y.1970).

Here, the total damages sought from all defendants is approximately $8,000,000. The partial settlement has a total value to plaintiff of up to $1.35 million including a "war chest" of $350,000 cash and shares in 3CI worth approximately $1 million. Thus, the partial settlement from settling defendants represents almost 17% of the total damages sought from all defendants.

Another important consideration is the continuing existence of 3CI. At this time, 3CI is a viable corporation. If the litigation continues, the potential for bankruptcy is real, after which recovery from the corporation is questionable. Moreover, litigation is costly and the vagaries of litigation are legion.

#### 4. Judgement of the parties

The last factor in determining whether a settlement is fair, reasonable and adequate is the judgement of the parties that the settlement is fair and reasonable. Again, on balance, I find that the proponents of the proposed settlement have clearly shown that the settlement is fair, adequate, and reasonable and is in the best interest of the members of the plaintiff class. *See Weinberger v. Kendrick, supra;* Fed.R.Civ.P. 23(e).

■ The views and experience of counsel are legitimate factors to consider. *In re New Mexico Natural Gas Antitrust Litig., supra.* Courts have consistently refused to substitute their business judgment for that of counsel and the parties. *See e.g. In re King Resources, Co. Securities Litig.,* 420 F.Supp. 610 (D.Colo.1976) and *Zerkle v. Cleveland–Cliffs Iron Co.,* 52 F.R.D. 151 (S.D.N.Y.1971).

Here, plaintiff's counsel, who has had significant experience in securities class actions, believes the partial settlement is in the best interests of the class. Moreover, out of approximately 1,300 potential class members who were notified of the proposed settlement, as of August 30, 1989 only five had filed notification of their wish to opt out of the settlement. Also, no class member has filed an objection to the settlement. Thus, the overwhelming majority of the class members concede that the settlement is fair.

Non-settling defendants have expressed concern that the inside directors who received $1,400,000 from the stock offering and who are contributing a mere $100,000 to the settlement are getting off cheap. I agree, and share this concern. However, I "must determine only that sufficient compensation is being paid to the class, and need not speculate as to the appropriate contribution of each [settling] defendant." *See Masterson v. Pergament,* 203 F.2d 315, 330 (6th Cir.), *cert. denied,* 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953).

### III. SETTLEMENT APPROVAL

In opposing the partial settlement, non-settling defendants raise two related questions:

1. to what extent can the Court bar non-settling defendants from maintaining crossclaims for indemnity and contribution against settling defendants or otherwise extinguish non-settling defendants' claims arising out of, based on, or related to the settled claims; and

2. in what manner will any judgment that ultimately may be entered against non-settling defendants be reduced as a result of the partial settlement.

Several federal courts have recently fashioned a compromise between the competing interests of contribution and settlement by approving partial settlements and at the same time barring non-settling defendants from prosecuting claims for contribution against settling defendants. This bar against claims for contribution (settlement contribution bar) is entered only in conjunction with an order directing that the non-settling defendants' liability, in the event a judgment is rendered against them, will be reduced in accordance with the settlement (set-off). *Donovan v. Robbins,* 752 F.2d 1170 (7th Cir.1985); *In re Sunrise Securities Litig.,* 698 F.Supp. 1256 (E.D. Pa.1988). Set-off is the justification for eliminating a non-settling defendant's right to contribution, because the set-off reduces the non-settling defendant's ultimate liability for damages. *See e.g. Donovan, supra.*

Here, pursuant to Section VIII C.(2) of the proposed settlement, settling parties seek an order that would:

Extinguish any rights, claims, or causes of action by the Non–Settling Defendants, ... against the Settling Defendants, ... and any and all of their present and former partners, principals, officers, directors, insurers, employees, agents, [and] attorneys, ... which claims arise out of, are based upon, or are otherwise related to the Settled Claims, including but not limited to claims for contribution and/or indemnification.

Absent this order, or waiver in whole or in part of this condition, the agreement fails.

### A. Federal Indemnity and Contribution

Non-settling defendants contend that the federal securities statutes under which they have been sued provide them with potential causes of action for indemnification and contribution against the settling defendants which I may not extinguish.

### 1. Indemnification

■ Indemnification is defined as a means of shifting the entire loss to another who, for equitable reasons, should pay alone, while contribution means a sharing of the loss. W. Keeton, D. Dobbs, K. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 51 (5th ed. 1984). "There is an important substantive difference between contribution in which the loss is distributed among tortfeasors by requiring each to pay a ... share to one who has discharged their joint liability, and indemnity in which one tortfeasor is required to reimburse in full one who has discharged a common liability." Note, *Contribution Under the Federal Securities Laws*, 1975 Wash.U.L.Q. 1256 (1975). *See also* Prosser & Keeton § 51 at 341.

The statutory purposes of the Securities Act and the Exchange Act include "assuring diligent performance of duty and deterring negligence." *Laventhol, Krekstein, Horwath, & Horwath v. Horwitch*, 637 F.2d 672 (9th Cir.1980), *cert. denied, sub nom., Frank v. U.S. Trust Co. of New York*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). Commensurate with this purpose, there is no express right to indemnification for liability incurred under either § 11 of the Securities Act or § 10(b) of the Exchange Act. Also, there is no implied right to indemnification for liability incurred under § 11, because to imply a right to indemnification would undermine the Act's statutory purpose. *Laventhol, supra.* In *Heizer Corp. v. Ross*, 601 F.2d 330 (7th Cir.1979) the Court stated:

> Whereas contribution supports the policy of securities legislation, indemnification tends to frustrate and defeat it. A securities wrongdoer should not be permitted to escape loss by shifting his entire re-

sponsibility to another party. If indemnification were allowed, those found liable for the breach of a statutory obligation might escape liability as effectively as if contribution were denied.

Moreover, claims for indemnification based on other sections of either the Securities Act or the Exchange Act, have been rejected uniformly as contrary to the regulatory nature of the federal securities laws. *See* e.g. *Tucker v. Arthur Andersen & Co.*, 646 F.2d 721 (2nd Cir.1981) and *Stowell v. Ted S. Finkel Inv. Services, Inc.*, 641 F.2d 323 (5th Cir.1981).

Accordingly, I hold that there is no express or implied right to indemnification under § 11 of the Securities Act or § 10(b) of the Exchange Act.

### 2. Contribution

Contribution is an equitable doctrine based on the principle that a person who discharges a liability shared with another should not bear the sole obligation for payment. *See* W. Prosser, *The Law of Torts* § 50 (4th ed. 1971). Contribution distributes plaintiff's damage among the wrongdoers by requiring each to contribute to plaintiff's total damages. 1 Dooley, *Modern Tort Law* § 26.01 (1977).

At early common law, English courts did not permit an intentional tortfeasor to recover in contribution. *See Merryweather v. Nixan*, 101 Eng.Rep. 1337 (K.B. 1799). In years past, the majority of American jurisdictions extended this rule to preclude contribution even among negligent tortfeasors. *See* e.g. *Atkins v. Johnson*, 43 Vt. 78 (1870); *Miller v. Fenton*, 11 Paige Ch. 18 (N.Y.1844). Today, however, most states permit contribution among joint tortfeasors to some extent, although there is great variation among the states as to the measure of damages and effect of a settlement on the right to contribution. *See Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 87 n. 17, 101 S.Ct. 1571, 1578 n. 17, 67 L.Ed.2d 750 (1981) (thirty-nine states and the District of Columbia now recognize some right of contribution among tortfeasors).

The developing trend to allow contribution has been motivated primarily by two policy objectives: fairness to defendants and deterrence. *Nelson v. Bennett,* 662 F.Supp. 1324 (E.D.Cal.1987). First, contribution promotes a more fair and equitable distribution of plaintiffs' losses among all wrongdoers. *Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). Second, contribution ensures that the deterrent effect of the law will be felt by all persons liable, rather than merely those persons named as defendants. *Id.* Here, Hanifen claims rights of contribution under § 11 of the Securities Act and § 10(b) of the Exchange Act.

### a. § 11 claims

§ 11 of the Securities Act (15 U.S.C. § 77k(f)) expressly provides for a right to contribution. § 77k(f) states:

> All or any one or more of the persons specified in subsection (a) of this section shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation.

Accordingly, Hanifen's claims for contribution under § 11 are properly before me.

### b. § 10(b) Claims

■ § 10(b) of the Exchange Act creates neither an express private right of action nor a right to contribution. However, the courts imply a private cause of action for the statute's violation. *See* e.g. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946). Having implied a private cause of action, it became incumbent upon the courts to define remedies available to private parties damaged by violations of the Exchange Act. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Among the remedies flowing from this implied cause of action is an implied right of contribution. *deHaas v. Empire Petroleum Co.,* 286 F.Supp. 809 (D.Colo.1968), *rev'd in part on other grounds,* 435 F.2d 1223 (10th Cir. 1970) (punitive damages not allowed in private action under Rule 10b–5). Hanifen's claims for contribution under § 10(b) are, therefore, properly before me.

### B. Settlement Contribution Bar

■ The issue then is whether, in order to encourage settlement of federal securities actions, these express and implied rights of contribution should be subject to an implied settlement contribution bar rule?

Contribution inhibits settlement, particularly in complex, multiple defendant actions such as this. *See Huddleston v. Herman & MacLean,* 640 F.2d 534 (5th Cir.1981), *rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). In response to this inhibiting effect on settlement, many states, including Colorado, have enacted statutes known generically as "settlement bar statutes." *See* e.g. Cal. Civ.Proc.Code § 877.6 (Supp.1987) and § 13–50.5–105(1)(b), C.R.S. (1987 Repl.Vol. 6A). Under such statutes, if a settlement meets the statutory requirements, a settling defendant has the means to "buy its peace" through a bar to any contribution action against the settling defendant.

By contrast, federal securities statutes do not expressly provide a settlement contribution bar rule. Thus, I must determine whether to imply a settlement contribution bar rule here.

The primary policies underlying rights of contribution under the Securities and Exchange Acts are the promotion of fairness to defendants and the deterrence of wrongdoing. In contrast, the primary policy underlying settlement contribution bar rules is the encouragement of settlements. The purpose of a settlement contribution bar rule is to "harmonize the equitable objectives of contribution with the encourage-

ment of settlement." *First Fed. Sav. & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.*, 631 F.Supp. 1029 (S.D.N.Y.1986).

A "no-bar" rule inhibits settlements because there is little incentive to enter into a settlement that does not terminate or reduce future financial exposure. *Nelson v. Bennett, supra.* As the court in *In re Nucorp Energy Securities Litig.*, 661 F.Supp. 1403 (S.D.Cal.1987) concluded, under a "no bar" rule, partial settlement may be virtually impossible because any defendant who refuses to settle, for whatever reason, forces all other defendants to trial.

Federal courts have long recognized the public policy in favor of the settlement of complex securities actions. *See e.g. Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir.1976). Indeed, considering the congested federal docket, the promotion of settlement is, as a practical matter, "an absolute necessity." *Nelson, supra.*

Benefits of partial settlements include: (1) immediate compensation for plaintiffs; (2) ability for settling defendants to avoid litigation and pursue more productive matters such as salvaging a company; and (3) encouraging remaining defendants to settle, thus promoting settlements and judicial economy. Adamski, *Contribution and Settlement in Multiparty Actions Under Rule 10b–5*, 66 Iowa L.Rev. 533 (1981) (hereinafter cited as *Contribution and Settlement* ). In short, the federal interest in encouraging settlements is an "overriding" one which would be frustrated by the application of a no-bar rule.

On the other hand, a settlement contribution bar rule tends to frustrate the twin goals of fairness and deterrence. Such a rule could: (1) leave non-settling defendants with unfair shares of liability; (2) coerce settlements of frivolous claims; (3) encourage collusion; and (4) diminish deterrence because the most culpable can "buy their peace" cheaply. *Nelson v. Bennett, supra.*

These effects, however, can be avoided by either requiring judicial approval before barring contribution as required by the pro tanto offset rule, or by applying the proportionate offset rule which inherently addresses these concerns. *See* discussion *infra*, at 2.

Under either rule of offset, the settlement contribution bar accommodates both the interests of settlement and of fairness and deterrence. Therefore, I hold that an implied contribution bar rule exists under § 11 of the Securities Act, § 10(b) of the Exchange Act, and 10b–5 of the SEC regulations thereunder.

Finally, § 11's silence as to any settlement contribution bar in the face of its express right of contribution does not lead to a contrary result. Adopting such a rule for § 11 contribution claims as well as § 10(b) and Rule 10b–5 claims, leads to consistency while promoting and harmonizing the policies underlying contribution and settlement.

### 1. Federal or state settlement contribution bar rule

■ Next, I determine the basis of the settlement contribution bar. This determination is governed by federal law because federal securities acts are being construed. *First Fed. Sav. & Loan v. Oppenheim, Appel, Dixon, supra.* However, because the federal statutes prescribe no express settlement contribution bar rule, I may either adopt the district's state statute as the federal law, or alternatively, fashion a uniform federal rule. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). Federal courts which have considered this choice have come to opposite conclusions. *Compare Nelson v. Bennett, supra*, (uniform federal rule) *with First Fed. Sav. & Loan v. Oppenheim, Appel, Dixon, supra* (adopting N.Y. state law). In fashioning the rule, I balance the need for a nationally uniform body of law against the advantages of applying the state statute. *Nelson v. Bennett, supra.*

■ There are sound reasons to adopt a uniform national settlement contribution bar rule. First, the rule affects key substantive federal rights. *Heizer Corp. v. Ross, supra* (contribution is substantive right). And, when an issue is central to a

federal regulatory scheme, national uniformity is particularly apt. *See United States v. Kimbell Foods, Inc., supra.* Second, adoption of state bar statutes promotes disparate results because many states have no such statute while those that do, have varying types. Consequences of these disparate results include forum shopping, conflicts of law litigation with resulting waste of judicial and public resources, and inequitable outcomes. *Nelson v. Bennett, supra.* Considering the federal securities laws' dual purposes of fairness and equity, adopting state statutes could thwart the overall federal regulatory scheme.

On the other hand, adopting the district's state statute avoids the potential practical difficulties in a case such as this where different settlement contribution bar standards could apply to federal and pendent state claims. *First Fed. Sav. & Loan v. Oppenheim, Appel, Dixon & Co., supra.* Although there are pendent state claims in this case, I must craft a rule applicable generally to this type of action.

Upon balancing the above considerations, I conclude that the need for a nationally uniform body of law outweighs the advantages of applying the state statute. Thus, I hold that a uniform federal settlement contribution bar rule governs in federal securities actions.

### 2. *Pro tanto or proportionate rule*

Having decided that a uniform federal settlement contribution bar is proper, I turn to the form of the offset. The settling and non-settling parties present two different views. Alvarado and settling defendants urge adoption of a pro tanto rule. That rule allows the deduction only of the amount of settlement from the ultimate liability of non-settling defendants. The non-settling defendants argue that the offset should be proportionate. The proportionate rule allows non-settling defendants to set off against their ultimate liability, the settling defendants proportionate share of liability as determined at trial. I adopt the proportionate rule.

### a. *Pro tanto rule*

Under the pro tanto rule, any judgment against non-settling defendants is reduced pro tanto, that is, by the amount actually paid in settlement by settling defendants. *See Uniform Contribution Among Tortfeasors Act § 4 (1955).* For example, if plaintiff is paid $30,000 in settlement by defendant A and then obtains a judgment against defendant B for $100,000, defendant B would be required to pay $70,000 and would have no recourse against defendant A.

The policy supporting the pro tanto rule is promotion of settlements. Settlements are encouraged because the settling defendant is insulated from further liability while plaintiff continues to have the opportunity to collect the remainder of total damages from the non-settling defendants. However, under the pro tanto rule, the risk that the settlement amount will prove less than the settling defendant's proportionate share of any eventual judgment is borne by the non-settling defendant. Also, under the pro tanto rule, the most culpable defendants might well buy out quickly and possibly too cheaply. Thus, this rule tends to promote "bad" settlements. *In re Sunrise Securities Litig., supra;* Adamski, *Contribution and Settlement.*

### b. *Proportionate Rule*

A proportionate rule, on the other hand, provides that any judgment against the remaining defendants is reduced by the settling defendant's share of plaintiff's damages. Adamski, *Contribution and Settlement.* To illustrate, if plaintiff settles with defendant A for $30,000 and obtains a judgment against B for $100,000, and it is determined at trial based on proportionate fault that defendant A's appropriate share of total damages is $50,000, plaintiff's judgment against defendant B would be reduced by $50,000. Plaintiff would thus receive a total of $80,000. Under this approach, the risk of a "bad" settlement is borne by plaintiff. Therefore, plaintiff has incentive to obtain a "good" settlement and to secure from each settling defendant a share of damages proportion-

ate to fault. Thus, the proportionate rule is equitable in that, early on, it forces the parties to address degrees of culpability to apportion damages. And, because contribution is an equitable doctrine, equitable considerations should drive the determination of the form of the settlement contribution bar.

■ I conclude that the pro tanto rule, while promoting expedient settlements, does so at the expense of equitable considerations. The pro tanto rule, however, tends to encourage a hasty, ill-conceived settlement between plaintiff and the most culpable defendants. Further, while the settlement may not be collusive or in bad faith, it may be for a relatively small share of the damages. Litigation then proceeds against non-settling defendants who now bear the burden of a skewed settlement.

Moreover, although proponents of the pro tanto rule tout its benefit of judicial efficiency, to ensure that settlement approximates results at trial, a fairness hearing must be held before judicial approval of the settlement. *See Nelson v. Bennett, supra.* This procedure, if too modest or streamlined, undermines the protective cloak of judicial review of settlement fairness that is the basis for adoption of a settlement contribution bar in the first place, while judicial involvement adequate to assure fair settlements inevitably reduces the efficiency of the pro tanto rule.

In this context, preservation of judicial resources is an important consideration. However, it should not be the sole, or even overriding, factor. Ultimately the role of the judiciary and the trial process is to fairly assess culpability in determining the outcome of litigation.

On the other hand, application of the proportionate rule allows the traditional burdens of litigation to remain where they belong—with plaintiff. If plaintiff wants a "war chest" to fund the litigation through settlement with some of the defendants, plaintiff should bear the risk of an inadequate settlement. *In re Sunrise, supra.* Also, while under this rule plaintiff bears the risk of an unfair or unwise settlement, plaintiff has an incentive to obtain a

shrewd and informed settlement. If settling defendants pay an amount greater than their proportionate fault as later determined at trial, plaintiff benefits because it retains the entire prior settlement.

Moreover, although not determinative of the issue, settling defendants collaterally agreed to a form of a proportional fault assessment in their underwriting agreement with Hanifen. ¶ 7(d) states, in pertinent part:

> If the indemnification provided for . . . is unavailable to or insufficient to hold harmless an indemnified party . . . then each . . . party shall . . . contribute . . . in such proportion as is appropriate to reflect . . . the relative benefits received . . . *but also the relative fault* . . . as well as any other relevant equitable considerations. . . . The Company, the Selling Stockholders and the Underwriters agree that it would not be just and equitable if contribution . . . were determined . . . by any . . . method of allocation which does not take account of the equitable considerations referred to above in this subsection (d).

(emphasis added).

Based on the foregoing and in light of the equitable nature of the doctrine of contribution, I hold the proportionate rule to be the offset applicable in federal securities cases. The agreement proposed by the settling parties is premised on application of a pro tanto rule. Therefore, I cannot approve the agreement as presented.

### C. State Law and Other Claims

■ Non-settling defendants also contend that I cannot extinguish their pendent state claims or potential claims of non-parties to this action. I agree in part.

As stated earlier, in order to ensure that no party shirks its responsibility under federal securities laws and to preserve the deterrent effect of those laws, courts refuse to enforce claims for indemnification created by contract. *See e.g. Globus v. Law Research Service, Inc.,* 287 F.Supp. 188 (S.D.N.Y.1968), *aff'd in part and rev'd in part,* 418 F.2d 1276 (2nd Cir.1969). Thus, any state claim under an indemnifica-

tion agreement that is coextensive with a federal indemnification claim may be extinguished because of the overriding federal concerns at issue. *See e.g. Globus Inc. v. Law Research Service, Inc.,* 318 F.Supp. 955 (S.D.N.Y.1970), *aff'd per curiam,* 442 F.2d 1346 (2nd Cir.1971) (breach of contract); *Stratton Group, Ltd. v. Sprayregen,* 466 F.Supp. 1180 (S.D.N.Y.) (common law fraud); *Greene v. Emersons, Ltd.,* 1983–84 Fed.Sec.L.Rep. (CCH) ¶ 99,852, at p. 97, 271 (S.D.N.Y.1983) (any state law claims that are merely disguised attempts at seeking indemnity must be dismissed). Accordingly, I hold that any state claim, however denominated, which seeks indemnity, may be extinguished through dismissal.

■ Non-settling defendants also seek contractual contribution under Colorado law based on the provisions of the parties' underwriting agreement. Colorado affords a statutory right to contribution. § 13–50.5–102, C.R.S. (1987 Repl.Vol.6A). Also, there is a Colorado settlement contribution bar statute which determines the amount of setoff by proportionate fault. *Brochner v. Western Ins. Co.,* 724 P.2d 1293 (Colo.1986); §§ 13–21–111.5, 13–50.5–103, and 13.50.5–105. The Colorado state statute and the uniform federal rule allowing a contribution bar are consistent. Consequently, to the extent there are state claims seeking contribution, these claims may be extinguished through the settlement contribution bar.

■ Further, to the extent non-settling defendants seek damages for breach of warranty, breach of contract, fraud, and negligent misrepresentation, measured by its liability for violation of the Securities and Exchange Acts, such claims may be extinguished. *See Greene v. Emersons, Ltd., supra.* However, to the extent damages may be claimed beyond those sought for violation of the Securities and Exchange Acts, such claims are independently viable pendent state claims, and while, in my discretion, I may decline to exercise pendent jurisdiction, *see Ritter v. Colorado Interstate Gas Co.,* 593 F.Supp. 1279 (D.Colo.1984) and *Kerby v. Commodity Resources, Inc.,* 395 F.Supp. 786 (D.Colo. 1975), I may not "extinguish" them.

■ Finally, "non-settling defendants" are defined in the settlement agreement to mean "Hanifen, Imhoff, Inc., *each and every underwriter who participated in the March 18, 1987 public offering of 3CI common stock,* and Deloitte, Haskins & Sells." (emphasis added). To the extent settling parties seek to bar claims by persons or entities other than Hanifen and DHS, such persons or entities are not before me. Fundamental due process principles prohibit claim extinguishment against anyone not a party to this action. *Martin v. Wilks,* —— U.S. ——, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989).

## IV. SUMMARY

The settling parties' agreement is fair, adequate, and in the best interest of this conditionally certified settlement class within the meaning of Fed.R.Civ.P. 23(e). I can extinguish all non-settling defendants' pleaded or potential indemnification claims as contrary to the regulatory scheme of the federal securities laws. Further, I can extinguish non-settling defendants' pleaded or potential express and implied contribution claims through application of a federally based settlement contribution bar rule, and state contribution claims through Colorado's consistent statutory settlement contribution bar rule.

However, I cannot approve the proffered partial settlement because: (1) it requires application of the ill-conceived pro tanto rule; (2) certain pleaded and potential pendent state claims cannot be "extinguished"; and (3) I cannot bar potential claims of non-parties to this action.

ACCORDINGLY, IT IS ORDERED that:

1. the settlement between plaintiff and settling defendants is fair, reasonable and adequate, and is hereby approved pursuant to F.R.C.P. 23(e); however,

2. MOTION for orders approving partial settlement and plan of distribution is DENIED.