36 F.3d 916
 63 USLW 2212, Fed. Sec. L. Rep. P 98,476,
30 Fed.R.Serv.3d 806
 TBG, INC., Plaintiff,
v.
Richard A. BENDIS, W. Terrance Schreier, Defendants,
and
John G. Pappajohn, Robert H. Mann, Jr., Shook, Hardy &
Bacon, Defendants-Appellees.
ERNST & WHINNEY, Defendant-Appellant,
v.
Richard S. MASINTON, Continental Healthcare Systems, Inc.,
TBG Information Systems, Inc., Third-Party
Defendants-Appellees,
and
Paul R. Billington, George A. Bridgmon, Third-Party Defendants.
TBG, INC., Plaintiff,
v.
Richard A. BENDIS, Ernst & Whinney, Defendants,
and
W. Terrance Schreier, Defendant-Appellant.
John G. PAPPAJOHN, Robert H. Mann, Jr., Shook, Hardy &
Bacon, Defendants-Appellees,
v.
Richard S. MASINTON, Continental Healthcare Systems, Inc.,
TBG Information Systems, Inc., Third-Party
Defendants-Appellees,
and
Paul R. Billington, George A. Bridgmon, Third-Party Defendants.
TBG, INC., Plaintiff,
v.
Richard A. BENDIS, Defendant-Appellant,
and
John G. Pappajohn, Robert H. Mann, Jr., Shook, Hardy &
Bacon, Defendants-Appellees.
W. Terrance SCHREIER, Ernst & Whinney, Defendants,
v.
Richard S. MASINTON, Continental Healthcare Systems, Inc.,
TBG Information Systems, Inc., Third-Party
Defendants-Appellees,
and
Paul R. Billington, George A. Bridgmon, Third-Party Defendants.
 Nos. 93-3130 to 93-3132 and 93-3173.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 19, 1994.
 
 Michael G. Norris (Bruce Keplinger, with him on the briefs), Payne & Jones, Chartered, Overland Park, KS, for appellant Bendis.
 Melanie T. Morris, Ernst & Young, Washington, DC (Kathryn A. Oberly, Ernst & Young, Washington, DC, with her on the briefs, for appellant Ernst & Whinney; John R. Cleary, Husch & Eppenberger, Kansas City, MO, with her on the briefs, for appellant Schreier).
 John H. Calvert, Lathrop & Norquist, Kansas City, MO (Daniel M. Dibble, with him on the briefs), for defendants-appellees Mann and Pappajohn.
 Herbert E. Milstein (Lisa M. Mezzetti and Daniel S. Sommers, with him on the briefs), Cohen, Milstein, Hausfeld & Toll, Washington, DC, for appellee TBG.
 John G. Koeltl, DeBevoise & Plimpton, New York City (Andrew C. Hartzell, Jr., Lorna G. Schofield and Daniel J. Goldstein, DeBevoise & Plimpton, New York City; John J. Jurcyk, Jr., McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, with him on the briefs), for appellee Shook, Hardy & Bacon.
 Before WHITE, Associate Justice (Ret.),[1] ANDERSON and BALDOCK, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 The appellants, defendants who have not agreed to settle with TBG, Inc., challenge the district court's order approving TBG's settlements with three other defendants. We do not have jurisdiction to review the court's order approving TBG's settlement with Robert Mann and John Pappajohn, but we do review the order approving TBG's settlement with Shook, Hardy & Bacon ("Shook"). We vacate that order because the court impermissibly barred the nonsettling defendants' contribution claims against the settling defendants, as well as independent claims by Bendis against Shook.
 
 BACKGROUND
 
 2
 TBG acquired Continental Healthcare Systems, Inc. in 1986. In 1988, TBG sued Richard Bendis, the former president of Continental, Terrance Schreier, the former executive vice president, Robert Mann and John Pappajohn, former outside directors, Shook, Hardy & Bacon, Continental's outside counsel, and Ernst & Whinney, Continental's outside auditor. TBG claimed that these defendants had misrepresented Continental's financial status when TBG acquired it, and sought relief under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. Secs. 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. Sec. 240.10b-5.
 
 
 3
 In January 1992, Mann and Pappajohn agreed to settle with TBG for $200,000 and the release of their claims for payment of their legal expenses. In September 1992, Shook also agreed to settle with TBG for a confidential sum. Bendis, Schreier, and Ernst & Whinney have not agreed to settle.
 
 
 4
 Both the Shook and the Mann and Pappajohn settlements were contingent on the district court entering an order barring all related claims against them by the nonsettling defendants and ordering that the judgment at trial be reduced by the settlement amounts. The district court approved these agreements in a memorandum opinion dated December 30, 1992. 811 F.Supp. 596. On January 4, 1993, the court signed separate orders approving each settlement, making the required orders, and certifying each as final and appealable under Fed.R.Civ.P. 54(b). The court entered judgment on the Shook settlement on January 5, then entered the Mann and Pappajohn judgment on January 6.
 
 
 5
 On January 11, Bendis filed a motion to reconsider the court's "Memorandum and Order dated December 30, 1992, and its Order and Judgment dated January 4, 1993." Appellant's App. at 355. The court denied this motion on February 18.
 
 
 6
 The appellants did not receive a copy of the court's order denying the motion to reconsider, and did not learn of it until April 14. On April 15, they filed a joint motion for an extension of time to file notices of appeal. The next day the court gave the appellants fourteen days to appeal, and all three nonsettling defendants appealed both of the settlement approvals within that time.
 
 
 7
 On April 23, however, Mann and Pappajohn moved to reconsider the court's order extending the time for appeal of the order approving their settlement with TBG. On May 4, the court granted their motion because they had already completed their settlement in reliance on the passage of time for appeal. The court subsequently denied for lack of jurisdiction Bendis's motion for leave to amend his notice of appeal to include an appeal of the court's withdrawal of this extension. Besides appealing the original orders approving the settlements, Bendis also appeals the court's order rescinding the extension of time to appeal and the court's order denying leave to file an amended notice of appeal. The other appellants did not appeal the court's refusal to extend the time for appealing the approval of the Mann and Pappajohn settlement.
 
 DISCUSSION
 I. Jurisdiction
 
 8
 Bendis did not appeal the district court's approval of the Mann and Pappajohn settlement within the thirty days permitted by Fed.R.App.P. 4(a)(1). Therefore we do not have jurisdiction over his appeal unless the court validly extended the time for appeal. See Oda v. Transcon Lines, 650 F.2d 231, 233 (10th Cir.1981) (per curiam). Bendis argues on appeal that his notice of appeal was effective because the court abused its discretion when it withdrew the extension of time to appeal the approval of the Mann and Pappajohn settlement. See Jones v. W.J. Servs., Inc. (In re Jones), 970 F.2d 36, 39 (5th Cir.1992) (noting that appellate court must affirm district court's decision whether to extend time under Rule 4(a)(6) unless the court abused its discretion).
 
 
 9
 Because Bendis and the other nonsettling defendants did not receive notice of the court's judgment denying the motion to reconsider, Rule 4(a)(6) allowed the court to extend the time for them to appeal if doing so would not prejudice any party. The district court rescinded the extension of time to appeal because it would prejudice Mann and Pappajohn. We must accept this finding of prejudice because it is not clearly wrong. See In re Marchiando, 13 F.3d 1111, 1114 (7th Cir.1994) (treating prejudice under Rule 4(a)(6) as a factual finding).
 
 
 10
 Mann and Pappajohn had already completed their settlement with TBG before Bendis asked for an extension of time to appeal. They told the district court that they had made their settlement payment relying on the passage of time for anyone to appeal the court's approval of their settlement. Extending the time for appeal would prejudice Mann and Pappajohn if they did settle in reliance on the finality of the court's approval. See Fed.R.App.P. 4 advisory committee's note to 1991 amendment ("Prejudice might arise, for example, if the appellee had taken some action in reliance on the expiration of the normal time period for filing a notice of appeal."). Even though they could get their settlement payment back if the settlement was reversed on appeal, they still would lose the settlement itself as well as some of their money's value.
 
 
 11
 Bendis argues that Mann and Pappajohn could not have relied on the passage of time for appeal because they actually completed their settlement before the time for appeal had passed. Bendis claims that his motion to reconsider extended the time for appeal to March 20, thirty days after the court denied the motion on February 18. Since Mann and Pappajohn completed their settlement on March 18, Bendis reasons, they could not have relied on the finality of the settlement approval.
 
 
 12
 However, Bendis's motion to reconsider did not extend the time for appealing the court's approval of the Mann and Pappajohn settlement. The court separately approved the two settlements in two different judgments, both of which it certified as final and appealable under Rule 54(b). As the district court later found, Bendis moved to reconsider only the approval of the Shook settlement. His motion only referred to a single "Order and Judgment dated January 4, 1993." Appellant's App. at 355. The motion itself indicates that this refers to the Shook order, not the Mann and Pappajohn order, because it specifically challenges the court's "Order barring Bendis from pursuing any potential state law negligence action against the defendant Shook, Hardy & Bacon." Id. The motion also referred to the court's December 30 memorandum, which discussed both settlements, but clearly did so only because that memorandum discussed the Shook settlement, not because Bendis intended to imply a challenge to both judgments of January 4. Furthermore, Bendis's supporting memorandum challenges only the Shook approval, and the district court's opinion rejecting the motion discusses only the Shook settlement.
 
 
 13
 Since Bendis moved to reconsider only the Shook approval, the motion extended the time to appeal only that judgment. Bendis correctly observes that a motion to reconsider a judgment allows the court to alter that judgment on any grounds and extends the time for any party to appeal that judgment on any issue. See Fed.R.App.P. 4(a)(4); Diaz v. Romer, 961 F.2d 1508, 1510 (10th Cir.1992); Varley v. Tampax, Inc., 855 F.2d 696, 699-700 (10th Cir.1988). But a motion to reconsider one final judgment does not extend the time to appeal another final judgment just because they are part of the same litigation. See Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 511-12 (7th Cir.1989) (explaining that a motion to reconsider a separately appealable award of costs does not effect the time for appealing the judgment on the merits); Martin v. Campbell, 692 F.2d 112, 114-16 (11th Cir.1982) (observing that a motion for a new trial by one defendant also extends the time to appeal a verdict in favor of a second defendant, unless the district court certifies the judgments as separate and final under Rule 54(b)).
 
 
 14
 Apparently Bendis also misinterprets the statement in Rule 4(a)(4) that "the time for appeal for all parties runs from the entry of the order" denying a Rule 59(e) motion. This simply means that the motion extends the time in which "all parties" can appeal the judgment to which the Rule 59(e) motion applies, not that it extends the time to appeal any other separate judgment relating to some other party.
 
 
 15
 The time to appeal the Mann and Pappajohn settlement therefore expired on February 5, thirty days after the court entered its judgment approving the settlement. Mann and Pappajohn did not complete their settlement until March 18, well after the time for appeal had passed. Therefore the court's finding that Mann and Pappajohn relied on the finality of the approval is not clearly erroneous, and extending the time for appeal would have prejudiced them.
 
 
 16
 Bendis also points out that the district court originally granted the extension of time under both Rule 4(a)(5) and Rule 4(a)(6), yet the court did not discuss Rule 4(a)(5) when it rescinded the extension. However, the court could not have granted the extension under Rule 4(a)(5) in the first place, since Rule 4(a)(5) would only permit an extension if Bendis requested it within thirty days after his time for appeal expired. As we have explained, the time for appealing the approval of the Mann and Pappajohn settlement expired on February 5. The court therefore could grant an extension under Rule 4(a)(5) only if Bendis requested it by March 7. Bendis first asked for an extension on April 15. Therefore, despite the court's reference to Rule 4(a)(5), the court could not properly grant the extension under that rule, and the court's failure to discuss it when rescinding the extension is irrelevant. Nor could the motion for an extension of time itself qualify as a proper notice of appeal because it was not "filed within the time constraints of an approved Rule 4(a)(5) motion." Listenbee v. City of Milwaukee, 976 F.2d 348, 350 (7th Cir.1992); see also Smith v. Barry, 502 U.S. 244, ----, 112 S.Ct. 678, 682, 116 L.Ed.2d 678 (1992) ("If a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal.").
 
 
 17
 Finally, Bendis claims that we can hear his appeal because he appealed late in reliance on the district court's order extending the time for appeal. Bendis blatantly misrepresents the "unique circumstances" doctrine, which permits a late appeal if the appellant received an extension before the original appeal period expired and filed an appeal within that extended period, even though the court later rescinded the extension. See Bernstein v. Lind-Waldock & Co., 738 F.2d 179, 182-83 (7th Cir.1984) ("[I]f before the time for filing the notice of appeal has expired the district judge grants an extension of time ... and the appellant relies on the extension, the notice of appeal is timely if filed within the extended time."); Stauber v. Kieser, 810 F.2d 1, 1-2 (10th Cir.1982) (per curiam); National Indus. v. Republic Nat'l Life Ins., 677 F.2d 1258, 1264 (9th Cir.1982). But Bendis did not request an extension before his original thirty-day appeal period expired. Even by his own account, his initial appeal period expired on March 20, but he did not request an extension until April 15. He therefore did not let his original appeal period expire in reliance on an extension, and the unique circumstances doctrine does not excuse his late appeal.
 
 
 18
 Consequently, we do not have jurisdiction over Bendis's appeal of the order approving the Mann and Pappajohn settlement. We affirm both the district court's order granting the motion to reconsider its order extending the time for appeal and the court's denial of leave for Bendis to file an amended notice of appeal. As for Mann and Pappajohn's motion to dismiss Bendis's appeal, they filed their motion well beyond the "favored" fifteen-day period without explaining why filing within fifteen days of the notice of appeal was "impracticable." 10th Cir.R. 27.2.1. Because we do not have jurisdiction regardless of Mann and Pappajohn's motion to dismiss, we deny that motion without considering when we should accept late motions to dismiss.
 
 
 19
 Since none of the other defendants timely appealed the approval of the Mann and Pappajohn settlement, we do not have jurisdiction to review the $200,000 judgment reduction ordered by the court in its judgment approving the Mann and Pappajohn settlement. Nor may we review the scope of the bar order in that order and judgment.
 
 II. Bar of Contribution Claims
 
 20
 The court's order approving the Shook settlement barred any of the other defendants from bringing contribution or other related claims against Shook. The court compensated the nonsettling defendants for the loss of their claims against Shook by ordering a pro tanto judgment reduction. That is, the court ordered any judgment against the nonsettling defendants to be reduced by the amount Shook pays in settlement to TBG.
 
 
 21
 We have not previously considered whether courts can bar contribution and other related claims in order to facilitate partial settlement in federal securities cases. Nor have we decided whether and how courts should reduce the trial award to reflect the settlement. See FDIC v. Geldermann, Inc., 975 F.2d 695, 698, 700 (10th Cir.1992). The district court inferred from an earlier Tenth Circuit decision that we would adopt the pro tanto method. See Hess Oil Virgin Islands Corp. v. UOP, Inc., 861 F.2d 1197, 1208-10 (10th Cir.1988). That decision only considered state law claims, however, and dealt with the very different issue of whether the court should deduct the plaintiff's percentage of fault before or after a pro tanto settlement credit. Id.
 
 
 22
 We review de novo whether ordering a pro tanto judgment reduction permits the court to bar contribution claims based on Rule 10b-5 liability. The appellants have said that they do not deny the court's power to bar claims; they only argue that the court must order a proportional fault credit rather than a pro tanto credit. Regardless of how the appellants state the issue, however, they cannot ask us or the district court to order a different judgment credit than the pro tanto credit to which the settling parties agreed. The settlement is contingent on the court ordering a pro tanto credit; if the court orders some other credit, there is no settlement. The appellants therefore cannot claim that the court erred because it did not order a proportional credit. The court could not have made such an order. The issue can only be whether the court erred by approving the settlement and ordering the requested contribution bar and pro tanto credit.
 
 
 23
 The appellants do not argue that the court erred simply because it ordered a pro tanto judgment reduction. In fact, they would have no reason to object to the pro tanto credit if the court left them free to bring contribution claims for any difference between the credit and the settling defendants' share of the liability. Despite their apparent misunderstanding of how the court might have erred, the appellants essentially maintain that the court erred by barring their contribution claims. They argue that the bar order was an error because the court did not also order adequate compensation for their barred contribution claims. We agree that the bar order was impermissible, but for a different reason. We conclude that orders barring contribution claims are permissible only because a court or jury has or will have properly determined proportional fault and awarded the equivalent of a contribution claim, not because of the compensatory award alone. Since the court did not decide the settling defendants' proportional fault and order a credit in that amount, the court had no power to bar the nonsettling defendants' contribution claims.
 
 
 24
 We disagree with the concurrence that we could reverse "more economical[ly]" by analogizing to McDermott, Inc. v. AmClyde, --- U.S. ----, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). Concurring Op. at 932. Since McDermott only required proportional fault credits in admiralty cases, see McDermott, --- U.S. at ---- - ----, 114 S.Ct. at 1464-65, we cannot say that approving a different credit in this case was reversible error. Furthermore, the court in McDermott had the freedom to weigh and choose from various possible credits because the settlement itself did not mandate a credit. See id. at ----, 114 S.Ct. at 1463. The court in this case, however, could only approve or disapprove a settlement with a pro tanto credit. McDermott explains why courts should choose a proportional fault credit when they are free to choose, and orders them to do so in admiralty, but it does not explain why approving a different credit on which a settlement depends would be an error where the Supreme Court has not mandated a proportional fault credit. Agreeing with McDermott that a pro tanto credit does not fully compensate for lost contribution rights does not lead to the conclusion that approving a pro tanto credit itself is a reversible error. It does suggest that barring contribution claims to recover any difference between the credit and the settling defendants' proportional fault would be inappropriate, but it does not explain why, since no bar order was at issue in McDermott. We explain here why barring contribution claims in such a case is an error.
 
 
 25
 Defendants have a federal right to contribution in Rule 10b-5 actions. Musick, Peeler & Garrett v. Employers Ins., --- U.S. ----, ---- - ----, 113 S.Ct. 2085, 2090-91, 124 L.Ed.2d 194 (1993). Although related to an implied cause of action, this contribution right is statutory, not merely equitable. The Supreme Court recognized the right to contribution because Congress would have authorized contribution claims if it had expressly authorized the 10b-5 action. Id. The Court did not create a federal common law contribution right, and refused to consider the equity or efficiency of the contribution right. Id. at ----, 113 S.Ct. at 2090. Courts therefore have no power to take away that right for equity or policy reasons, even if such reasons might justify modifying or extinguishing common law contribution rights.
 
 A. Encouraging Settlement
 
 26
 Nevertheless, courts often have barred claims for contribution in Rule 10b-5 actions when the parties to a partial settlement have requested a bar order. Almost every court that has identified the source of its power to enter a bar order has relied entirely on precedent and the federal policy encouraging settlements. See, e.g., Wald v. Wolfson (In re U.S. Oil & Gas Litig.), 967 F.2d 489, 494 (11th Cir.1992); Kovacs v. Ernst & Young (In re Jiffy Lube Sec. Litig.), 927 F.2d 155, 160 (4th Cir.1991); In re Atlantic Fin. Mgmt., Inc. Sec. Litig., 718 F.Supp. 1012, 1016 (D.Mass.1988). These courts typically reason that defendants will never agree to a partial settlement if the court does not protect them from further exposure by barring contribution and similar claims against them. See, e.g., Jiffy Lube, 927 F.2d at 160 ("The justification for imposing a bar to contribution ... is that ... the right to contribution removes the incentive to settle...."); In re Nucorp Energy Sec. Litig., 661 F.Supp. 1403, 1408 (S.D.Cal.1987) (asserting that without a bar order, "partial settlement of any federal securities case before trial is, as a practical matter, impossible").
 
 
 27
 We disagree that the interest in settlement can give courts the power to bar statutory contribution claims. Although federal policy generally encourages settlement, that policy does not override statutory rights. Courts may not extinguish such rights in order to facilitate settlement unless the statute authorizes them to do so. Nor do judgment reductions or other compensation alone justify barring statutory claims. Courts do not have the general power to bar statutory claims just because they offer fair compensation. The absence of a statutory provision forbidding such orders does not suggest that courts have the power to issue them. But see Franklin v. Kaypro Corp., 884 F.2d 1222, 1229 (9th Cir.1989) (reasoning that since "nothing in either the statute or our prior decisions ... says contribution cannot be satisfied prior to a full trial," the "overriding public interest" in settlements permits bar orders).
 
 
 28
 Even if courts could assume this power when necessary to permit settlement, bar orders are not necessary to partial settlements. Although a bar order may be more convenient than the alternatives, the court and the plaintiff can protect settling defendants from further exposure without a bar order. For example, the plaintiff can agree to indemnify the settling defendants against claims by the nonsettling defendants that are based on their liability to the plaintiff. See, e.g., In re San Juan Dupont Plaza Hotel Fire Litig., 907 F.2d 4, 5 & n. 2 (1st Cir.1990); Resolution Trust Corp. v. Evans, No. 92-0756, 1993 WL 354796, at * 1 (E.D.La. Sept. 3, 1993); In re Washington Pub. Power Supply Sys. Sec. Litig., 720 F.Supp. 1379, 1398-99 (D.Ariz.1989), aff'd, Class Plaintiffs v. City of Seattle, 955 F.2d 1268 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992); In re National Student Mktg. Litig., 517 F.Supp. 1345, 1346 (D.D.C.1981). The plaintiff also may agree to defend the settling defendants, so that the defendants do not face more litigation expenses. Such an indemnity agreement encourages defendants to settle just as much as a bar order does. See McDermott, --- U.S. at ----, 114 S.Ct. at 1467. The settling defendant does not have to worry about further exposure, while the plaintiff assumes no greater risk than it would with a bar order and appropriate compensation for barred claims. Sometimes this may add to the burden on the courts, id., but most of the time the nonsettling defendants will have brought cross-claims for contribution that the court can decide in the same trial even though the settling defendants have settled the primary claim against them. This burdens the court no more than a proportional fault credit would. Whatever the added burden, necessity cannot justify bar orders. They may be helpful, but they are not necessary.
 
 
 29
 If Congress wants to allow bar orders, it can follow the many states that have authorized courts to bar contribution claims if they provide a specified reduction of any judgment against nonsettling defendants. See, e.g., Cal.Code of Civ.Proc. Sec. 877.6 (Supp.1994); Ill.Ann.Stat. ch. 70, p 302 (Smith-Hurd 1989); Md.Ann.Code art. 50, Sec. 20 (1991); Mass.Gen.L. ch. 231B, Sec. 4 (1986); N.Y.Gen.Oblig.L. Sec. 15-108 (1989); Wash.Rev.Code Ann. Sec. 4.22.060 (West 1988); Jiffy Lube, 927 F.2d at 160 n. 2. Without such a law, ordering a judgment credit alone does not give courts the power to bar federal statutory contribution claims.
 
 
 30
 Admittedly, private agreements do not create the unique incentives to settlement that a bar order with a pro tanto credit creates. The pro tanto method guarantees that the plaintiff will get whatever the jury awards at trial. The plaintiff does not risk making a low settlement and getting less than that amount. The plaintiff therefore can enjoy the benefits of settling, including funding further litigation, without discounting its recovery, forcing the nonsettling defendant to pay most of that discount after trial. See Franklin, 884 F.2d at 1230. Defendants also have a greater interest in settling in order to avoid paying more than their share after trial. See McDermott, --- U.S. at ----, 114 S.Ct. at 1468. However, the pro tanto method creates these additional incentives by unfairly shifting the risk of low settlements from the plaintiff to the nonsettling defendants. See id. at ----, 114 S.Ct. at 1469; Alvarado Partners, L.P. v. Mehta, 723 F.Supp. 540, 553 (D.Colo.1989).
 
 
 31
 Although private alternatives may not increase the incentives to settle, they generally do not decrease the incentives either. They leave the plaintiff in a position similar to a full settlement. An indemnity agreement lets a plaintiff enjoy the benefits of a favorable settlement and suffer the consequences of a low settlement. These alternatives therefore do not penalize a plaintiff for settling, and give the plaintiff just as much of an incentive to settle with a defendant for an amount approximating the defendant's likely liability.
 
 
 32
 Indemnity agreements or other private arrangements may discourage partial settlement with certain defendants, however. The plaintiff has less incentive to settle with defendants whose probable liability significantly exceeds their ability to pay. If the plaintiff settles for what such defendants can pay, and a jury later sets their share of damages at a higher amount, the plaintiff will come up short. But if the plaintiff keeps such defendants in the case, the plaintiff will be able to collect the entire judgment from the other defendants and make them seek contribution from the defendants with fewer resources. See TBG Inc. v. Bendis, 811 F.Supp. 596, 604 n. 16 (D.Kan.1992); FDIC v. Geldermann, Inc., 763 F.Supp. 524, 529-30 (W.D.Okla.1990), rev'd, 975 F.2d 695 (10th Cir.1992).
 
 
 33
 Nevertheless, the interest in settlement does not justify depriving third parties of their statutory rights. See United States Fidelity & Guar. v. Patriot's Point Dev. Auth., 772 F.Supp. 1565, 1575 (D.S.C.1991) ("To the extent there is tension between the goal of promoting settlements and fundamental fairness to litigants, the latter must prevail."); In re Sunrise Sec. Litig., 698 F.Supp. 1256, 1261 (E.D.Pa.1988); cf. United States v. Reliable Transfer Co., 421 U.S. 397, 408, 95 S.Ct. 1708, 1714, 44 L.Ed.2d 251 (1975) ("Congestion in the courts cannot justify a legal rule that produces unjust results in litigation simply to encourage speedy out-of-court accommodations."). The unique settlement incentives of the pro tanto method therefore do not justify its use.
 
 B. All Writs Act
 
 34
 Although the interest in settlement cannot empower a court to bar contribution claims, the All Writs Act may. At least one court has claimed the power to issue a bar order under the All Writs Act. In re Washington Pub. Power Supp. Sys. Sec. Lit., 720 F.Supp. 1379, 1399 (D.Ariz.1989). The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. Sec. 1651(a). This authority includes enjoining further suits relitigating issues a court has already decided. See, e.g., Farmers Bank v. Kittay (In re March), 988 F.2d 498, 500 (4th Cir.) ("The All Writs Act empowers a federal court to enjoin parties before it from attempting to relitigate decided issues and to prevent collateral attack of its judgments."), cert. denied, --- U.S. ----, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993); In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d 328, 335 (2d Cir.1985).
 
 
 35
 We agree with the concurrence, the Ninth Circuit, and most other courts that have decided the issue that the Rule 10b-5 contribution right entitles a defendant to recover the amount of damages attributable to another party's fault. See Smith v. Mulvaney, 827 F.2d 558, 560-61 (9th Cir.1987). Therefore, if a court or jury properly decides the settling defendants' share of the fault and somehow credits that amount to the nonsettling defendants, the All Writs Act probably would authorize an order barring future contribution claims because they would necessarily relitigate that issue. However, the finding on which a credit is based precludes relitigation, not the credit itself. If there were only a credit and no finding of relative fault, a nonsettling defendant would be free to file a subsequent contribution action to recover the difference between the credit awarded and the amount he claims is attributable to the settling defendants' fault. The court in that later action would then have to decide the parties' proportional fault in order to decide whether the nonsettling defendant paid more than his share of the liability even after the judgment credit. Only the finding of proportional fault, on which a proportional fault credit is based, can estop the nonsettling defendant from litigating that issue in a later contribution action.
 
 
 36
 The concurrence suggests that "statutory construction" and "traditional equitable powers" are "ample authority" for a bar order. Concurring Op. at 936. The concurrence does not explain at all how it interprets section 10(b) to authorize bar orders. Such extraordinary statutory construction could infer such authorization from almost any statute. As for "traditional equitable powers," the early Supreme Court cases cited by the concurrence simply express the authority now codified in the All Writs Act, 28 U.S.C. Sec. 1651(a). Even if traditional equitable powers were distinct from the All Writs Act, the concurrence cites no case indicating that those traditional powers give courts greater freedom to enjoin future litigation than the All Writs Act does. The concurrence has not identified any source of power to enter bar orders other than the one we have identified: the power to bar relitigation of issues already decided by the court. See Root v. Woolworth, 150 U.S. 401, 411-12, 14 S.Ct. 136, 138-39, 37 L.Ed. 1123 (1893) (describing courts' power to "effectuate their own decrees by injunctions ... in order to avoid the relitigation of questions once settled between the same parties"); Farmers Bank, 988 F.2d at 500; Baldwin-United, 770 F.2d at 335; Wood v. Santa Barbara Chamber of Commerce, 705 F.2d 1515, 1524 (9th Cir.1983), cert. denied, 465 U.S. 1081, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984). Therefore, when a party challenges a bar order, we logically should ask first whether the court already decided the issues or claims the relitigation of which the order enjoins. If not, the court cannot bar future litigation of those issues.
 
 
 37
 The district court in this case did not order that the jury would decide the settling defendants' share of the liability. Nor did the court determine their share in the fairness hearing, because the court relied on many other factors in deciding that the settlement was fair. See TBG, 811 F.Supp. at 605-07. Such a hearing could not possibly estop relitigation of issues decided therein, and therefore permit a bar order under the All Writs Act, unless the court directly decided the settling defendants' share of fault and followed procedures that would fully and fairly adjudicate the issue. See Kremer v. Chemical Constr. Co., 456 U.S. 461, 480-81, 102 S.Ct. 1883, 1896-97, 72 L.Ed.2d 262 (1982); Willner v. Budig, 848 F.2d 1032, 1034 (10th Cir.1988) (per curiam), cert. denied, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989); Greenblatt v. Drexel Burnham Lambert, Inc., 763 F.2d 1352, 1361 (11th Cir.1985). The district court did not hold such a hearing before ordering the pro tanto credit. In fact, settlements with such hearings would be rare, since defendants could not receive a discount reflecting the uncertainty of trial. See McDermott, --- U.S. at ----, 114 S.Ct. at 1467.
 
 
 38
 Furthermore, we doubt that even an extensive hearing that would ordinarily estop relitigation could justify an order barring a nonsettling defendant's contribution claims against a settling defendant. The All Writs Act only authorizes such orders in aid of the court's jurisdiction. 28 U.S.C. Sec. 1651(a). It does not authorize a court to assume jurisdiction over claims not otherwise before it. A court therefore cannot bar further contribution claims if it does not have jurisdiction to decide the defendants' proportional fault in the first place. The district court may not have had jurisdiction to decide Shook's contribution liability, especially since the nonsettling defendants had not filed cross-claims for contribution. We doubt that the potential contribution defendant's request to have the court decide its contribution liability could give the court jurisdiction to effectively decide an unwilling potential contribution plaintiff's claim. Cf. Ebanks v. Great Lakes Dredge & Dock Co., 688 F.2d 716, 722 (11th Cir.1982) (holding that trial court erred by requiring the jury to allocate fault between a nonsettling defendant and a settling defendant instead of leaving that issue for the nonsettling defendant's separate contribution action), cert. denied, 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983). But since the district court did not decide the settling defendants' proportional fault anyway, we do not have to decide in this case if and when a district court has the power to determine a settling defendant's proportional fault in a fairness hearing or at trial.
 
 
 39
 The concurrence complains that it is "difficult to understand" why we raise this question. Concurring Op. at 933. The concurrence first observes that a proportional fault credit "is fully consistent with the purposes behind nonsettling defendants' relative fault contribution rights." Id. We agree, of course, but courts may not decide claims over which they have no jurisdiction just because doing so is "consistent with the purposes behind" those claims.
 
 
 40
 The concurrence also points out that the settling defendants' absence is unimportant because they are voluntarily absent, they do not face further liability, and the plaintiff will litigate their liability fully. Again, we agree, but these observations are beside the point. The settling defendants' absence is relevant to this question only because it makes the proportional fault decision seem even further beyond the court's jurisdiction. In a case such as this one, once the settling defendants are gone neither the potential contribution claim nor the parties to that potential claim are before the court.
 
 
 41
 Our concern that the potential contribution claim was not before the court "mystified" the concurrence because the court should be able "to consider the question as part of its resolution of the judgment credit required," which is "highly relevant to the remaining parties' dispute." Concurring Op. at 934. This reasoning mystifies us. The concurrence assumes the question to be decided, claiming that a court has authority to decide relative fault because it has the authority to enter a judgment credit based on that finding. But there is no specific grant of authority to enter proportional fault judgment credits. A court only has authority to enter a judgment credit because doing so may be part of resolving the dispute before it. The court cannot step outside the boundaries of that dispute to set a judgment credit just because it will be relevant to and prevent a separate dispute in the future between the settling and nonsettling defendants. Without a contribution claim, the court does not have before it a legal claim to which proportional fault is relevant. Liability in Rule 10b-5 cases is strictly joint and several and is never allocated among individual defendants in deciding the plaintiff's claim. See U.S. Indus. v. Touche Ross & Co., 854 F.2d 1223, 1261 (10th Cir.1988); G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 963 (5th Cir.1981); cf. Borden, Inc. v. Florida East Coast Ry., 772 F.2d 750, 753 (11th Cir.1985) (holding that trial court plainly erred by allocating joint and several tort damages according to jury's determination of defendants' relative fault). The defendants' relative fault is therefore irrelevant to the plaintiff's claim. A court cannot make Rule 10b-5 liability comparative by allocating fault among defendants when their contribution claims are not before the court. Cf. Ebanks, 688 F.2d at 722 (holding that court erred by directing jury to decide settling defendant's proportional fault in plaintiff's case rather than in separate contribution action). Nor can the court accept jurisdiction over a question not relevant to the legal claim before it just because the plaintiff or even both parties ask it to.
 
 
 42
 The concurrence claims that the Supreme Court's admiralty decision in McDermott implies that the court could allocate proportional fault in this situation. See Concurring Op. at 934. However, unlike securities law, admiralty law is comparative, which allows courts to allocate fault among the defendants in deciding the plaintiff's claim, regardless of whether the defendants have filed contribution claims. See United States v. Reliable Transfer Co., 421 U.S. 397, 411, 95 S.Ct. 1708, 1715-16, 44 L.Ed.2d 251 (1975); Leger v. Drilling Well Control, Inc., 592 F.2d 1246 (5th Cir.1979). As the Supreme Court explained in McDermott, an admiralty defendant will be liable only for its proportional share of the liability unless "factors beyond the plaintiff's control" limit other responsible parties' liability. McDermott, --- U.S. at ----, 114 S.Ct. at 1471. Since settlement is not such an "outside force[ ]," id., the nonsettling defendants in admiralty remain liable only for their share of the liability. The issue of proportional fault therefore remains relevant to the primary claim in admiralty. Although both admiralty law and securities law seek to allocate fault among defendants, they do so in different ways. Securities law requires a contribution claim before the court can order the jury to divide damages among the defendants. A court cannot assume jurisdiction over a contribution claim that is not before it simply because that claim has the same purpose as a comparative fault or other law that allows the court to allocate fault in the primary claim. The concurrence cites three cases allowing trial courts to order proportional fault credits "without the presence of settling defendants." Concurring Op. at 934. But none of those cases discusses whether a court has jurisdiction to decide proportional fault, especially when the nonsettling defendants have not filed contribution claims. In fact, none of them even says that the nonsettling defendants had not filed contribution claims, so we doubt that the issue even occurred to those courts. In any event, their failure to discuss the possible jurisdictional problem is hardly persuasive authority.
 
 
 43
 Nevertheless, we do not have to decide now whether a court could have the jury allocate proportional fault in a case such as this one. The district court erred because neither the court nor the jury determined the settling defendants' proportional fault and therefore the court had no basis for barring the nonsettling defendants' federal contribution claims.
 
 III. Bar of Bendis's Independent Claims
 
 44
 Bendis also challenges the court's order approving the Shook settlement because it bars his independent claims along with his contribution and similar claims. We agree that the court abused its discretion by barring Bendis's independent state law claims.
 
 
 45
 State law governs whether the court can bar state law claims and under what circumstances. See In re Granada Partnership Sec. Litigs., 803 F.Supp. 1236, 1239 (S.D.Tex.1992); Sunrise Sec., 698 F.Supp. at 1257. However, apparently neither the Kansas legislature nor the Kansas courts have said whether courts can bar claims by a nonsettling defendant against a settling defendant.
 
 
 46
 Even if Kansas would permit bar orders of related claims, we do not think Kansas would go beyond any other jurisdiction and allow courts to bar even independent claims. Courts that have allowed bar orders have only barred claims in which the damages are "measured by" the defendant's liability to the plaintiff. Alvarado Partners, 723 F.Supp. at 554. Besides contribution and indemnity claims, these include any claims in which the injury is the nonsettling defendant's liability to the plaintiff. See U.S. Oil & Gas, 967 F.2d at 495-96; Alvarado Partners, 723 F.Supp. at 554. No court has authorized barring claims with independent damages.
 
 
 47
 The district court's bar order in this case goes beyond claims measured by Bendis's potential liability to TBG. The order bars Bendis
 
 
 48
 from asserting or pursuing, against Shook, Hardy & Bacon, ... any and all claims ... whether for contribution, indemnity or otherwise, ... involving or that arise out of or relate to any claim, demand, right or cause of action connected with, arising out of or based in whole or in part on any of the acts, omissions, facts, matters, transactions or occurrences alleged, described ... or involved or connected in any manner with this action or the allegations of or any judgment sought or obtained by the TBG Entities in this action....
 
 
 49
 Order & Judgment, Appellant's App. at 344. This order is virtually unlimited. It could bar truly independent claims because it bars "all claims ... that ... relate to any claim ... based in whole or in part on any of the ... facts ... connected in any manner with this action." This would include independent claims that were related factually but in which the damages were not based on Bendis's primary liability to TBG.
 
 
 50
 The appellees argue that even if the order is too broad, Bendis has no potential independent claims anyway. Since TBG bought all of the Continental stock, they reason, no third party could sue Bendis for some misconduct in the Continental acquisition that Bendis in turn might blame on Shook. Nevertheless, the district court did not find that Bendis has no independent claim, and we cannot be sure that Bendis might not have some independent claim that the order would bar. Furthermore, the court should not purport to bar claims it has no power to bar, even if it thinks that there really are no such claims.
 
 
 51
 Although Bendis challenges the scope of the bar order generally, he particularly complains that the order would bar a negligence claim against Shook if he was liable to TBG for misrepresentations. Kansas might permit a court to bar such a claim because it would be based on Bendis's liability to TBG, not on independent damages. Bendis would be suing Shook to recover the damages that he had to pay TBG, without which he would have no damages to claim from Shook. See, e.g., U.S. Oil & Gas, 967 F.2d at 495-96 (holding that court properly barred fraud and negligence claims against settling defendants because those claims were just another theory for recovering damages defendant had to pay to plaintiff); South Carolina Nat'l Bank v. Stone, 749 F.Supp. 1419, 1433 (D.S.C.1990).
 
 
 52
 However, we think Kansas would permit barring only claims for which the court provided adequate compensation through a judgment credit or other means. See, e.g., Patriot's Point, 772 F.Supp. at 1572. The court did not order adequate compensation for this barred claim. Bendis claims that Shook prepared a document limiting his liability, and therefore he would sue for any amount over that limit that he had to pay to TBG. Even with a fairness hearing, a pro tanto credit would not be even roughly equal to the value of this claim except by accident. The district court did not consider at all whether the settlement credit compensated Bendis for the loss of this potential claim when it found the settlement to be fair. We therefore conclude that the court abused its discretion in barring Bendis's potential malpractice claim and possible independent claims against Shook.
 
 
 53
 We AFFIRM the district court's order granting the motion to reconsider its order extending the time for appeal, as well as the court's denial of leave for Bendis to file an amended notice of appeal. We therefore DISMISS Bendis's appeal of the court's order approving the Mann and Pappajohn settlement for lack of jurisdiction. We also VACATE the district court's order approving the Shook settlement, entered January 5, 1993, insofar as it impermissibly bars federal statutory contribution claims, Bendis's independent state law claims, and Bendis's potential malpractice claim without providing adequate compensation.
 
 
 54
 WHITE, Associate Justice (Ret.), concurring in part and concurring in the judgment.
 
 
 55
 I join Parts I and III of the court's opinion and concur in the result reached in Part II of that opinion.
 
 
 56
 Defendants found to have violated Sec. 10(b) of the Securities Exchange Act of 1934 are jointly and severally liable to the plaintiff, who may collect the entire judgment from less than all of the defendants, even one of them. The section has been construed, however, to give defendants a right of contribution. Musick, Peeler & Garrett v. Employers Ins., --- U.S. ----, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993). Thus, if a plaintiff collects the entire judgment from one of two defendants, that defendant may collect from the other that portion of the damages attributable to the other defendant's relative fault; that contribution under Sec. 10(b) is indeed calculated according to relative fault rather than some other formula is outlined in Part III below, but the court today clearly agrees with this construction of the Sec. 10(b) contribution right. See Majority Op. at 925-926.
 
 
 57
 In this case, several defendants were sued. The plaintiff, appellee here, settled with some, but not all of the defendants. The settlement agreement provided that any judgment entered against the nonsettling defendants would be reduced by the amount of the settlement and that any order approving the settlement must bar the nonsettlors from seeking contribution from the settlors. The district court approved the settlement, and its order contained the bar order which was a condition of the settlement. The issue in this case is whether the order impermissibly interfered with the contribution rights of the nonsettling defendants. I agree with the court today that it did, but not for the reasons the court offers. As I see it, the order interfered with nonsettling defendant's contribution rights because the pro tanto credit it incorporated did not, and could not, necessarily reduce any judgment that might be entered against the nonsettlors to the amount flowing from the fault of the nonsettlors and, hence, may have forced them to pay damages more equitably attributable to the settlors.
 
 
 58
 * McDermott, Inc. v. AmClyde, --- U.S. ----, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994), convincingly explains why the pro tanto credit with a bar order infringes upon nonsettling defendants' relative fault contribution rights. In McDermott, the parties asked the Court to decide how liability should be distributed in admiralty cases after a partial settlement. The Court considered three alternatives identified by the American Law Institute:
 
 
 59
 "(1) The money paid extinguishes any claim that the injured party has against the party released and the amount of his remaining claim against the other tortfeasor is reached by crediting the amount received; but the transaction does not affect a claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation....
 
 
 60
 "(2) The money paid extinguishes both any claims on the part of the injured party and any claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation and seeks contribution....
 
 
 61
 "(3) The money paid extinguishes any claim that the injured party has against the released tortfeasor and also diminishes the claim that the injured party has against the other tortfeasors by the amount of the equitable share of the obligation of the released tortfeasor."
 
 
 62
 --- U.S. at ----, 114 S.Ct. at 1465 (footnote omitted).[1] The first ALI option essentially involves providing the nonsettling defendant a pro tanto judgment credit while leaving him free to pursue a contribution claim against the settling defendant. The second closely mirrors the regime the trial court approved in the Sec. 10(b) action now before us: the nonsettling defendant is given a pro tanto credit and he is barred from ever seeking further contribution against the settling defendant. The third option describes how fault is allocated when a proportionate share credit is employed.
 
 
 63
 In the process of analyzing which of these options should be utilized in admiralty cases, the Court acknowledged that admiralty defendants are jointly and severally liable to victorious plaintiffs. See McDermott, --- U.S. at ----, 114 S.Ct. at 1471. Joint and several liability, however, does create obvious inequities: one marginally culpable defendant may be held responsible for satisfying all of plaintiff's damages. To help ameliorate such inequities without sacrificing joint and several liability's objective of fully compensating the plaintiff for his injury, the Court has generally permitted admiralty defendants to pursue contribution actions from one another. See Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1973). Since United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), liability in admiralty actions has ordinarily been assigned to each responsible party according to his relative fault; consequently and unsurprisingly, contribution in admiralty is calculated according to relative fault principles and, thus, a defendant forced (by operation of joint and several liability) to pay plaintiff more than his equitable share of a damage award is allowed to seek monies from any defendant who has underpaid his equitable share. See, e.g., Leger v. Drilling Well Control, Inc., 592 F.2d 1246 (5th Cir.1979).
 
 
 64
 Recognizing that Reliable Transfer attempts to assure an equitable apportionment of liability between all responsible wrongdoers, the Court in McDermott turned to adjudge which of the three ALI options would be most consistent with its aim. Its discussion of the second option--a pro tanto credit without an opportunity to pursue contribution--is especially pertinent to our own analysis since, again, this is essentially the option the settlement agreement contemplated and the trial court approved in the securities action before us. The Court rejected this option in McDermott, holding it to be in irremediable conflict with Reliable Transfer. Provided with no opportunity to seek contribution from settling defendants, and afforded a judgment credit equal only to the actual dollar amount of the settlor agreement with plaintiff (and not his equitable share of the damages assessed at trial), a nonsettling defendant in such a regime is, the Court noted, often left liable for paying damages not in any way equitably attributable to him. The Court explained its point by reference to an example:
 
 
 65
 Suppose, for example, that a plaintiff sues two defendants, each equally responsible, and settles with one for $250,000. At trial, the non-settling defendant is found liable, and plaintiff's damages are assessed at $1 million. Under the pro tanto rule, the nonsettling defendant would be liable for 75% of the damages ($750,000, which is $1 million minus $250,000). The litigating defendant is thus responsible for far more than its proportionate share of the damages.
 
 
 66
 McDermott, --- U.S. at ---- n. 14, 114 S.Ct. at 1467 n. 14. In sum, then, rather than helping assure an equitable distribution of liability (within an admittedly joint and several liability scheme), the Court found ALI Option 2 fundamentally at odds with this objective. Instead of attempting a distribution of fault in accord with relative fault, it found such an option would often lead in the opposite direction, "to inequitable apportionments of liability, contrary to Reliable Transfer." Id. at ----, 114 S.Ct. at 1468.[2]
 
 
 67
 Accepting that the Sec. 10(b) contribution right attempts to ensure that liability in securities cases is distributed according to relative fault much as Reliable Transfer attempts to ensure that result in admiralty, it necessarily follows that it would be improper for a court to employ a pro tanto credit with a bar order in a Sec. 10(b) action just as the combination is impermissible in admiralty cases. Just as ALI Option 2 leads to results "contrary to Reliable Transfer," --- U.S. at ----, 114 S.Ct. at 1468, so too the settlement agreement before us is at odds with a contribution right that aims to ensure the same fundamental objective as Reliable Transfer.[3]
 
 
 68
 Appellees and the trial court themselves concede that employing an untamed pro tanto credit with a bar order is likely to leave nonsettling defendants liable for more than their jury-determined share of liability. Rather than abandoning the option, however, they propose a remedy. They suggest that, before the bar order is entered, a "good faith hearing" be held. At such a hearing a judge would review the proposed settlement to assure that it represents a fair forecast of the nonsettling defendant's relative share of the judgment; this would help keep to a minimum the number of instance in which a nonsettlor is left with the tab for a portion of the judgment properly attributable to settling defendants.
 
 
 69
 This proposed remedy is, however, manifestly inadequate. As the Court noted in McDermott, good faith hearings simply "cannot fully remove the potential for inequitable allocation of liability. First, to serve their protective function effectively, such hearings would have to be minitrials on the merits, but in practice they are often quite cursory. More fundamentally, even if the judge at a good-faith hearing were able to make a perfect forecast of the allocation of liability at trial, there might still be substantial unfairness when the plaintiff's success at trial is uncertain." McDermott, --- U.S. at ----, 114 S.Ct. at 1468 (footnotes omitted).[4]
 
 
 70
 In something of a last gasp, appellees argue that, even if it does compromise appellants' Sec. 10(b) contribution right, using a pro tanto rule in conjunction with a bar order is so successful at encouraging settlement that it should still be adopted. In effect, appellees suggest that we should drop our insistence on the full vindication of the nonsettlor's contribution rights in order to promote the maximum number of settlements and, with them, to enhance judicial efficiency. This is another unpersuasive suggestion. To begin, I am not convinced we are empowered to sacrifice nonsettling defendants' recognized statutory right to contribution under Sec. 10(b) merely to advance the efficiency interest in promoting additional partial settlements. Even if we were so empowered, McDermott raises substantial questions regarding whether limiting nonsettlors' contribution claims is, in fact, any better at promoting settlements than providing a proportionate share judgment credit. --- U.S. at ---- - ----, 114 S.Ct. at 1468-69.
 
 II
 
 71
 Unlike the court today, I think analogy to McDermott suffices to demonstrate why the trial court must be reversed. The entry of a pro tanto credit with a bar order creates a significant inconsistency with nonsettling defendants' relative fault contribution rights under Sec. 10(b) just as it does with Reliable Transfer. We have no need to explore the All Writs Act or other potential sources of authority for the bar order entered here: whatever authority may or may not have existed for the order, McDermott illustrates clearly why its combination with a pro tanto credit cannot be sustained. In sum, then, a far more economical route to the same result the court reaches does exist and it is one that has the virtue of responding directly to the arguments raised by the parties and trial court before us.[5]
 
 
 72
 Having overruled the trial court's approval of the settlement agreement, I agree with the court that we have no need or authority today to direct the entry of an alternative judgment credit. The settlement agreement in this case was conditioned on the approval of a pro tanto credit with a bar order; given that these conditions cannot be provided, a partial settlement no longer exists and the case must be remanded for further proceedings.
 
 
 73
 The court does press on, though, to offer some guidance to the parties and the court below by commenting on other possible settlement arrangements and whether they would or would not offend nonsettling defendants' Sec. 10(b) contribution rights. The court, for instance, mentions the option of supplying nonsettlors a pro tanto credit without also employing a bar order (essentially ALI Option 1). See Majority Op. at 923, 924. The Supreme Court in McDermott, however, frowned on this alternative, noting that
 
 
 74
 [i]t discourages settlement, because settlement can only disadvantage the settling defendant. If a defendant makes a favorable settlement, in which it pays less than the amount a court later determines is its share of liability, the other defendant (or defendants) can sue the settling defendant for contribution. The settling defendant thereby loses the benefit of its favorable settlement.
 
 
 75
 --- U.S. at ----, 114 S.Ct. at 1467 (footnote omitted).
 
 
 76
 Though the court today discusses the possibility of the plaintiff indemnifying the settling defendant against contribution actions in order to make settlement more attractive under Option 1, see Majority Op. at 924, the Supreme Court in McDermott clearly thought indemnity would not make the option more attractive: "The plaintiff can mitigate the adverse effect on settlement by promising to indemnify the settling defendant against contribution.... This indemnity, while removing the disincentive to settlement, adds yet another potential burden on the courts, an indemnity action between the settling defendant and plaintiff." --- U.S. at ----, 114 S.Ct. at 1467.[6]
 
 
 77
 At places in its opinion today the court also suggests that a proportional fault judgment credit might be employed. See, e.g., Majority Op. at 926 ("if a court or jury properly decides the settling defendants' share of the fault and somehow credits that amount to the nonsettling defendants, ... [a bar order] probably would [be] authorize[d]."). After making seemingly favorable comments about the use of a proportionate share judgment credit, however, the court insists that any proportionate fault reduction be "properly" determined and then proceeds to suggest that this may be an impossible task: "[t]he district court may not have had jurisdiction to [allocate a portion of Sec. 10(b) damages to settling defendants], especially since the nonsettling defendants had not filed cross-claims for contribution." Majority Op. at 926-927.
 
 
 78
 It is difficult to understand why the court questions the power of a trial judge to carry out a settlement agreement that provides for a proportionate share credit. To begin, it must be admitted that such a credit is fully consistent with the purposes behind nonsettling defendants' relative fault contribution rights under Sec. 10(b), much as it is with Reliable Transfer 's goals: far from foisting on the nonsettling defendant damages for which he is not responsible, this option assures nonsettlors they will ordinarily pay just their equitable share of the judgment. See McDermott, --- U.S. at ---- - ----, 114 S.Ct. at 1466-67.[7] One of our sister circuits has already made just this point in the process of approving the proportionate share judgment credit for use in Sec. 10(b) cases. See Franklin v. Kaypro Corp., 884 F.2d 1222 (9th Cir.1989).[8]
 
 
 79
 As for the absence of settling defendants who have been dismissed, they are no doubt protected from further liability since plaintiff has dismissed his action against them and nonsettling defendants receive a credit for the nonsettlors' full share of any judgment awarded, thus obviating any need for them to pursue any contribution action. Furthermore, it is truly the plaintiff, not the settlors, who will have a stake in the relative fault assigned to the settling defendants (since under a proportionate share regime the plaintiff is responsible for any fault attributed by the jury to the settling defendants that exceeds the amount of the settlement agreement, see supra n. 7); and, there is no doubt that the plaintiff will litigate the issue fully with the help, if need be, of the settlors as witnesses. In sum, then, it is the will of the settling parties that the respective share of the damages caused by the nonsettlors and the settlors will be determined at trial, without the presence of the settlors, and I see no reason to interfere with such an arrangement.[9]
 
 
 80
 With regard to the court's suggestion that nonsettlors must file contribution claims against settlors before a court might have "jurisdiction" to effectuate a proportionate share credit, I am mystified. As I have already argued, the settlors have no interest in the amount of fault assigned them by the jury; they are already relieved from any responsibility beyond the settlement agreement. The degree of the settlors' fault is, however, highly relevant to the remaining parties' dispute over the size of the judgment credit plaintiff will have to afford nonsettling defendants. I see no reason why a court would be powerless to consider the question as part of its resolution of the judgment credit required and the ultimate balance of obligations between the remaining parties. To require, as the court apparently would, a formal contribution action be filed--to mandate the presence of settling defendants--would only be a waste of time and effort, truly a judicial exercise in elevating form over substance.[10]
 
 
 81
 If any doubt lingers on this point, precedent should dispel it. The Court in McDermott held that a trial judge has the power to enforce a proportionate share credit regardless whether a contribution claim is filed in admiralty actions. See --- U.S. at ----, 114 S.Ct. at 1469. The Uniform Comparative Fault Act authorizes trial judges in states that adopt its measures to do the same. See 12 U.L.A. 50, 57 (1993 Supp.). The Ninth Circuit, too, has specifically ruled that a trial court is empowered to enforce a proportionate share credit without the presence of settling defendants in Sec. 10(b) actions. See Franklin, 884 F.2d at 1231.[11] Other courts have also apparently not been troubled with this practice, applying proportionate share credits without ever mentioning any Article III concerns, which, of course, every federal court has a duty to raise and consider for itself at every stage of a litigation. See, e.g., In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831 (2d Cir.1992); Austin v. Raymark Indus., Inc., 841 F.2d 1184 (1st Cir.1988).
 
 
 82
 In the face of this authority, the court suggests only that the "jurisdictional" issue is less acute in admiralty cases than securities controversies. It contends that "[l]iability in Rule 10b-5 cases is strictly joint and several and is never allocated among individual defendants in deciding the plaintiff's claim.... The [settling] defendants' relative fault is therefore irrelevant to the plaintiff's claim." Majority Op. at 927. By comparison, "admiralty law is comparative, which allows courts to allocate fault among defendants in deciding the plaintiff's claim...." Id. at 927-928.
 
 
 83
 This argument is unsatisfying. To begin, it fails to account for the fact that substantial authority outside admiralty has suggested that courts are empowered to decide settlors' fault in their absence as part of applying a proportionate share credit. The court creates a plain split with Franklin with regard to a trial court's power to enforce a proportionate share credit without a contribution claim, a case specifically decided in the Sec. 10(b) context, but it does so without comment. It necessarily intimates that the Uniform Comparative Fault Act is wrong as well, but never addresses the point directly. Furthermore, even with regard to its attempt to distinguish admiralty from securities cases, the court fails. Liability in admiralty is fully joint and several, just as it is in tort actions under the Uniform Comparative Fault Act, see 12 U.L.A. at 50 (1993 Supp.), and securities actions under Sec. 10(b). See, e.g., McDermott, --- U.S. at ----, 114 S.Ct. at 1471. It is simply that in each regime--admiralty, tort law under the Uniform Comparative Fault Act, and Sec. 10(b)--the joint and several liability rule has been tempered with an assurance (stemming from Reliable Transfer in admiralty and from the relative fault contribution right of both the Uniform Comparative Fault Act and Sec. 10(b)) that fault will be distributed according to relative fault when possible.[12] Deciding settling defendants' proportionate share of the liability in the primary action between plaintiff and nonsettlors (regardless of the existence of a contribution action) follows sensibly in each regime from this shared ambition and itself does no damage to the full vindication of joint and several liability principles.[13] Not one of the cases cited by the court for support, see Majority Op. at 927, ever holds that deciding absent settlors' share of the fault would be in any way inimical to the full satisfaction of joint and several liability rules in a Sec. 10(b) action.[14]
 
 
 84
 Finally, though some portions of the court's opinion today might be read to suggest otherwise, I see no reason why a settlement agreement providing a proportionate share judgment credit but conditioned on the entry of a bar order could not be approved. The bar order in such a scenario would surely be unnecessary given that a proportionate share credit provides a nonsettling defendant all that his relative fault contribution claim does--given that such a credit makes any further contribution actions superfluous "because the nonsettling defendants pay no more than their share of the judgment." McDermott, --- U.S. at ----, 114 S.Ct. at 1466. If, however, the parties wish to add such an order to their agreement, there would be ample authority for its issuance. Surely the federal courts are empowered to construe the contribution rights guaranteed by Sec. 10(b), to decide whether a particular judgment credit satisfies those rights, and, if it does, to ensure that nonsettlors recognize that the credit extinguishes any contribution rights they may have had against the settlors. All of this seems to me to involve no more than a problem of statutory construction and a decision to employ the court's traditional equitable powers to issue injunctions to protect its decrees against relitigation.[15] Moreover, while I agree with the court that the federal policy interest in promoting settlement cannot override nonsettling defendants' right to contribution, that interest may supply some additional basis for permitting the entry of a bar order when, coupled with a proportionate share credit, it would in no way trench upon nonsettlors' protected contribution right, but would merely provide an additional assurance to the settlor that he will never have to defend a contribution action. Certainly our sister circuit in Franklin, 884 F.2d at 1229, held this to be the case and I see no reason to express disagreement with its decision in this case.[16]III
 
 
 85
 One matter requiring explanation remains. I have argued that the settlement agreement must be rejected in large part because a pro tanto credit with a bar order creates an inconsistency with the nonsettling defendants' relative fault contribution right; I have noted, too, that the proportionate share judgment credit creates no such inconsistencies with the Sec. 10(b) right. The critical premise to both conclusions is, however, that the Sec. 10(b) contribution right is indeed one calculated according to relative fault.
 
 
 86
 The court today accepts the premise--readily admitting that contribution is calculated according to relative fault under Sec. 10(b), see Majority Op. at 925-26--and one might be tempted to leave the matter at that. It seems to me, however, that the point deserves more attention than either the court or I have, to this point, provided. It does so because, though the Supreme Court recognized that a right to contribution does exist under Sec. 10(b) in Musick, Peeler, it has to date left as an open question how that contribution is to be calculated under that section. And, the issue has not yet been spoken to by this circuit. Thus, because it has not yet been decided, and because so much of my argument depends on the matter, I pause here to offer some explanation for my view of the Sec. 10(b) right.
 
 
 87
 The place to start is, of course, with Musick, Peeler itself. Though the Court there declined to discuss in any detail the nature of the contribution right it found in Sec. 10(b), it did indicate that it was willing to recognize a contribution right under that section in large measure because such a right is explicitly mentioned Secs. 9 and 18 of Securities Exchange Act and these provisions are highly analogous to Sec. 10(b) in both structure and design. See 113 S.Ct. at 2091. To ascertain the nature of the Sec. 10(b) contribution right, thus, it is sensible to turn to examine these kindred provisions.
 
 
 88
 Sections 9 and 18 provide a defendant the opportunity to "recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment." 15 U.S.C. Secs. 78i(e) and 78r(b). The language "as in cases of contract" has led some to surmise that the contribution right under these sections is, in essence, a pro rata right--allowing for the apportionment of damages in equal portions amongst all defendants regardless of their relative fault. Professor Ruder, for one, has argued that
 
 
 89
 [t]he phrase "as in cases of contract" ... aids in answering the question "According to what method is the contribution to be allowed?" Theoretically contribution could be required either on a pro-rata basis of on some basis involving a degree of fault analysis. Since the Securities Acts incorporate the contract standard for contribution between tort-feasors, the pro-rata method used in common law contract cases should apply.
 
 
 90
 D. Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution, 120 U.Pa.L.Rev. 597, 650 (1972). Other advocates of the pro rata rule have pressed for its adoption less out of concern for congressional intent and more out of an interest in promoting efficiency: the pro rata rule is, they promise, the easiest contribution standard for courts to administer. See, e.g., W. Douglas & G. Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 178-180 (1933).
 
 
 91
 If contribution rights were to be determined on a pro rata basis under Secs. 9 and 18 (and, thus, one might suggest, under Sec. 10(b)), one might well argue that a pro rata judgment credit--one that assures a litigating defendant he will never be held liable in any ultimate judgment for a settling defendant's pro rata share of the damageswould be entirely fair to a settling defendant and permit the trial court's approval of a partial settlement. There would be no basis for suggesting, as I have above, that a proportionate share approach would assure consistency with the Sec. 10(b) contribution right.[17]
 
 
 92
 That said, like the only federal appellate court to have studied the issue in any depth, see Smith v. Mulvaney, 827 F.2d 558, 560-61 (9th Cir.1987), I do think contribution under Sec. 10(b) is measured by relative fault principles.[18] In response to Professor Ruder's suggestion that the "as in cases of contract" language found in Secs. 9 and 18 necessitates the use of a pro rata rule, I agree with Mulvaney, 827 F.2d at 561, that this reads far too much into an exceptionally murky phrase. To begin, "as in cases of contract" does not as a matter of plain language or obvious implication direct pro rata to be employed. There is, moreover, no legislative history suggesting Congress intended the phrase to endorse a pro rata rule or any other particular contribution scheme. See Mulvaney, 827 F.2d at 561. All extant historical evidence suggests, in fact, that the Act borrowed this phrase from the English Companies Act--and that the phrase was not directly aimed at assuring the application of a pro rata rule even in England, but only at avoiding peculiar restrictions on the contribution right in English common law at the time. Thus, if anything, the phrase appears to be now almost a vestigial remnant of another time and place, not some obvious endorsement of the pro rata rule.[19] Even if the language could be properly taken as directing us to the contribution rule in common law contract actions, finally, it would not be a foregone conclusion that pro rata rule must be employed. Pro rata is not always applied in common law contract actions; it sometimes gives way to a relative fault analysis when defendants are responsible for unequal portions of the liability.[20] As to the contention that the pro rata rule is preferable because of its ease in administration, Mulvaney and many recent commentators in the field have suggested that the relative fault method is only marginally more difficult for a court to employ. See Mulvaney, 827 F.2d at 561.
 
 
 93
 In the end, I think the contribution right under Sec. 10(b) is most plausibly viewed as a relative fault right largely because of the design and intention behind the contribution doctrine itself. Contribution was originally developed in courts of equity out of the concern that one defendant ought not to be unjustly benefitted at the expense of another. See id. at 561. See also Gould v. AmericanHawaiian S.S. Co., 387 F.Supp. 163 (D.Del.1974).[21] Thus, even as between wrongdoers, our courts do aim to provide some semblance of fairness. The relative fault rule gives full vent to this interest--allowing any defendant who has paid more than his equitable share to seek payment from those who have underpaid theirs. A pro rata contribution scheme, by contrast, allows one defendant to benefit unjustly at another's expense, except in those rare cases where each defendant is responsible for an equal share of any damage done.
 
 
 94
 That the pro rata rule is far less fair between defendants (and, thus, less harmonious with the purposes underlying contribution) receives support from a study of the Court's opinion in Reliable Transfer. There the Court overturned a century-old precedent under which joint tortfeasors in admiralty collision cases were liable for equal, or pro rata, shares of the damage and replaced it with a relative fault rule; in doing so the Court recognized that "[i]t is no longer apparent, if it ever was, that th[e] Solomonic division of damages serves to achieve even rough justice." --- U.S. at ----, 113 S.Ct. at 405. The Court noted, too, that virtually every maritime country in the world had already discarded the pro rata rule as unfair and had adopted a relative fault approach in its stead, id. at ---- - ----, 113 S.Ct. at 403-404, and pointed out that comparative negligence had long been the admiralty rule in personal injury actions, id. at ----, ----, 113 S.Ct. at 407, 409.
 
 
 95
 Others have also come to accept a relative fault approach as the fairer approach. While pro rata was once ascendant in state common law jurisprudence, relative fault has in recent years emerged as the dominant measure of contribution in large part because of a growing recognition of its superiority in promoting equitable results. See L. Kornhauser & R. Revesz, Settlements Under Joint and Several Liability, 68 N.Y.U.L.Rev. 427, 437 (1993). See also Uniform Comparative Fault Act Sec. 4(a), 12 U.L.A. at 54; Restatement (Second) of Torts Sec. 886A(2). Securities law commentators likewise overwhelmingly support the use of the relative fault rule in Sec. 10(b) cases out of concerns for fairness. See, e.g., L. Loss, ALI, Fed.Sec.Code 1418(f)(2) (Draft No. 2, 1976); M. Adamski, Contribution and Settlement in Multi-party Actions Under Rule 10b-5, 66 Iowa L.Rev. 553, 557 (1981); J. Fischer, Contribution in 10b-5 Actions, 33 Bus.Law. 1821, 1829 (1978); J. Freund & H. Hacker, Cutting Up the Humble Pie: A Practical Approach to Apportioning Litigation Risks Among Underwriters, 48 St. John's L.Rev. 461, 473 (1974).[22]
 
 
 96
 * * *
 
 
 97
 While joining Parts I and III of the court's opinion, for the reasons expressed above I concur only in the result reached in Part II.
 
 
 
 [1]
 The Honorable Byron R. White, Associate Justice of the United States Supreme Court (Ret.), sitting by designation, pursuant to 28 U.S.C. Sec. 294(a)
 
 
 [1]
 As the Court noted in McDermott, see --- U.S. at ---- n. 8, 114 S.Ct. at 1465 n. 8, these three options correspond to three model Acts drafted at different points in time by the National Conference of Commissioners on Uniform State Laws. ALI Option 1 corresponds to the Uniform Contribution Among Tortfeasors Act, drafted in 1939, 12 U.L.A. 57-59 (1975); ALI Option 2 represents the Revised Uniform Contribution Among Tortfeasors Act of 1955, id. at 63-107; ALI Option 3 tracks the Uniform Comparative Fault Act adopted in 1977, 12 U.L.A. 45-61 (1993 Supp.)
 
 
 [2]
 In case one were inclined to think low settlements few and far between and, thus, Option 2's inconsistency with Reliable Transfer only a rare and minor problem, McDermott has noted that "deviations from the equitable apportionment of damages will be common" under ALI Option 2 for "settlements seldom reflect an entirely accurate prediction of the outcome of a trial." --- U.S. at ----, 114 S.Ct. at 1467. The Court commented, too, that settlements will fail to represent a settling defendant's full share of the liability because a discount reflecting the uncertainties of trial will usually be built into the settlement figure--and because a plaintiff may be willing to accept a low amount in settlement with one defendant in order to develop a "war chest" to finance his litigation against the remaining defendants. Id
 
 
 [3]
 It is true that the Revised Uniform Contribution Among Tortfeasors Act (which ALI Option 2 describes) envisions barring nonsettlors from seeking contribution by statutory means, whereas in the case before us nonsettlors are barred from seeking contribution by an injunction. This distinction, however, makes no difference. Nothing in McDermott turned upon the means by which nonsettlors were barred from seeking contribution; likewise we need today say nothing about the particular means by which appellants are prevented from exercising their contribution rights. The critical point both in McDermott and the instant case is that the provision of a pro tanto credit alone without any additional right to contribution (however the negation of that right is achieved) is inimical to nonsettlors' rights
 
 
 [4]
 It is worth noting that, in the process of making its point about the inadequacy of good-faith hearings, the Court specifically made negative reference to the trial court's endorsement of such hearings in this case. See McDermott, --- U.S. at ---- n. 18, 114 S.Ct. at 1468 n. 18
 
 
 [5]
 The court avers at one point that analogy to McDermott will not suffice to justify overruling the trial court's decision since, in contrast with this case, "no bar order was at issue" and no settlement agreement was involved in McDermott. See Majority Op. at 923. As discussed above, McDermott specifically considered and rejected ALI Option 2 which incorporates a pro tanto credit while operating to bar nonsettlors from receiving anything further from settling defendants. Furthermore, as also suggested above, there is absolutely no basis in McDermott for believing that a trial court could any more approve a settlement agreement incorporating ALI Option 2 or some variant on it than it could impose such an option itself when left room to do so by the parties' settlement arrangements
 
 
 [6]
 The Court's reasons for finding a pro tanto credit without bar order unattractive even when coupled with the provision of indemnity by plaintiff are obviously in no way dependent upon the fact that McDermott arose in admiralty. Indeed, it is worth noting that the National Conference of Commissioners on Uniform State Laws, the very body that suggested Option 1 in 1939 for use in tort actions generally, came to reject it in its 1955 Revised Uniform Contribution Among Tortfeasors Act, for precisely the same reasons the Court rejected it in McDermott--viz. due to its tendency to discourage settlement and burden the courts with additional indemnity-oriented litigation. See 12 U.L.A. at 98-99 (commissioners' comment)
 
 
 [7]
 "Consider an example in which ... the two defendants are each equally at fault, and the plaintiff's damages are $100. If the plaintiff settles with one defendant for $20, under the [proportionate] share set-off rule it can recover only $50 from the other defendant, thus suffering a shortfall of $30. What happens, however, if the settlement is for $70?" Recovery is allowed under a pure proportionate share approach. L. Kornhauser & R. Revesz, Settlements Under Joint and Several Liability, 68 N.Y.U.L.Rev. 427, 439 (1993)
 
 
 [8]
 "Settling defendants pay an amount to which they voluntarily agree.... Nonsettling defendants never pay more than they would if all parties had gone to trial. This comports with the equitable purpose of contribution [determined by reference to relative fault]." Franklin, 884 F.2d at 1231
 
 
 [9]
 Though the use of a proportionate share judgment credit clearly envisions having the jury determine an absent settling defendant's share of the fault, the jury may not, of course, ascribe fault to an absent nonsettling defendant. See, e.g., Uniform Comparative Fault Act (12 U.L.A.) Sec. 2 (1993 Supp.). Present nonsettling defendants will, however, have every incentive to join any potentially liable absent nonsettling defendant that plaintiff has not already named in his action. See id
 
 
 [10]
 Contrary to the court's charge, see Majority Op. at 927, I hardly suggest here that a federal court can accept jurisdiction, willy-nilly, over any question put to it by two parties seeking an answer. Rather, my point is that I see requiring the filing of a contribution action as a mere formalism that Article III surely would not require. As will become evident in a moment, this is far from a novel suggestion
 
 
 [11]
 "Obviously, there will be a certain amount of 'finger-pointing' at the 'empty chair.' ... However, settling defendants will be protected ... and the financial motives of both plaintiffs and nonsettling defendants to vigorously press their arguments at trial will be unchanged." Franklin, 884 F.2d at 1231
 
 
 [12]
 If one nonsettling defendant's relative share is uncollectible, the joint and several liability rule might well operate to require a reallocation of fault. See, e.g., Uniform Comparative Fault Act, 12 U.L.A. at 50-51 (1993 Supp.)
 
 
 [13]
 Deciding the settling defendants' share of the liability in the primary action may result in plaintiff "underrecovering" or "overrecovering" his damages (placing on him as it does both the risk of a poor settlement and the benefit of an exceptionally good one). But, the Supreme Court in McDermott made plain that this in no way trenches upon joint and several liability principles. See discussion infra at n. 16. It is, after all, plaintiff's decision whether to settle or not to settle
 
 
 [14]
 By way of example, one of the cases the court relies upon, Borden, Inc. v. Florida East Coast Ry. Co., 772 F.2d 750 (11th Cir.1985), involved no settlement and held that the trial judge erred in apportioning damages according to relative fault no doubt because Florida state common law (which the court was interpreting) did not permit contribution according to relative fault, but only according to pro rata rules. See Lincenberg v. Issen, 318 So.2d 386, 393-94 (1975). Furthermore, Borden took no account of the Uniform Comparative Fault Act which plainly endorsed the idea that joint and several liability is not compromised by the entry of a proportionate share credit in tort. Another case the court relies upon, Ebanks v. Great Lakes Dredge & Dock Co., 688 F.2d 716 (11th Cir.1982), is an admiralty case whose authority may be questionable after McDermott
 
 
 [15]
 The equitable jurisdiction of a federal court to enter an injunction preventing relitigation of its decrees in the same court is beyond cavil. See, e.g., Root v. Woolworth, 150 U.S. 401, 14 S.Ct. 136, 37 L.Ed. 1123 (1893). See generally Dugas v. American Surety Co., 300 U.S. 414, 57 S.Ct. 515, 81 L.Ed. 720 (1937); Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). To the extent this same principle finds expression in the All Writs Act, that legislation would also support the issuance of a bar order
 
 
 [16]
 To this point, I have discussed only the court's rather unconventional objections to the application of the proportionate share credit in Sec. 10(b) cases--objections, incidentally, that neither the parties nor the trial court pressed. There do exist, however, a pair of more conventional arguments against applying the credit, ones raised by appellees and the trial court in the course of arguing that the imperfections of the proportionate share rule suggest the wisdom of approving a settlement agreement with a pro tanto credit. The two arguments are essentially flip-sides of the same coin and neither is persuasive
 First, one might argue that the proportionate share credit can operate to prevent a plaintiff from receiving a full recovery for his loss. And, indeed this can happen when a plaintiff's agreement with the settling defendants proves to be less than the settlors' jury-determined equitable share of the fault and plaintiff is left unable to recoup the difference from anyone (under a pro tanto regime, the plaintiff would recover the difference from the nonsettling defendant). One might suggest, thus, that a proportionate share credit should be rejected on the grounds that denying plaintiff a full recovery improperly elevates Reliable Transfer and the Sec. 10(b) relative fault contribution right's goal of an equitable distribution of fault between defendants over a joint and several liability regime's most fundamental objective of assuring plaintiff full recovery for his injury. The Supreme Court in McDermott, however, explained the fallacy inhering in this argument when it wrote that "[j]oint and several liability applies when there has been a judgment against multiple defendants. It can result in one defendant's paying more than its apportioned share of liability when the plaintiff's recovery from other defendants is limited by factors beyond the plaintiff's control, such as a defendant's insolvency. When the limitations on the plaintiff's recovery arise from outside forces, joint and several liability makes the other defendants, rather than an innocent plaintiff, responsible for the shortfall.... [T]he proportionate share rule announced in this opinion applies [only] when there has been a settlement. In such cases, the plaintiff's recovery against the settling defendant has been limited not by outside forces, but by its own agreement to settle. There is no reason to allocate any shortfall to the other defendants, who were not parties to the settlement." --- U.S. at ---- - ----, 114 S.Ct. at 1471-72 (footnotes omitted).
 Secondly and contrarily, one might object to a proportionate share judgment credit on the grounds that it occasionally leads to a violation of the "one satisfaction rule" by affording the plaintiff "overcompensation" (i.e. more than one hundred percent of the jury-determined damages). With the proportionate share rule, if plaintiff's agreement with the settling defendants is for an amount greater than the settlors' relative share of the damages, plaintiff is entitled to keep the full amount of the settlement plus all due him from the nonsettlor, thus resulting in a recovery of more than one hundred percent of the jury award. Again, however, the Court in McDermott saw no merit to this argument, see --- U.S. at ---- - ----, 114 S.Ct. at 1470-71, and its reasoning applies as persuasively outside the admiralty arena as it does within it. See Franklin, 884 F.2d at 1231.
 
 
 [17]
 If Sec. 10(b) were construed to extend a pro rata contribution right, it is obvious, however, that a pro tanto credit with a bar order would still likely create inconsistencies with that right
 
 
 [18]
 A few decisions predating Mulvaney did apparently consider the contribution right in securities fraud cases to be a pro rata right. See, e.g., Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, 540 F.2d 27, 39 (2d Cir.1976); Globus, Inc. v. Law Research Serv., Inc., 318 F.Supp. 955, 958 (S.D.N.Y.1970), aff'd., 442 F.2d 1346 (2d Cir.1971), cert. denied sub nom. Law Research Serv., Inc. v. Blair & Co., 404 U.S. 941, 92 S.Ct. 286, 30 L.Ed.2d 254 (1971). There are, however, a few reasons why these decisions do not carry much precedential weight. None paused to consider the nature of the contribution right involved, but only rotely applied the pro rata rule. In some of these decisions the joint tortfeasors were held equally culpable. Thus, the courts in these cases never had any serious need to consider whether the pro rata rule was correct or not since the ultimate distribution of liability would not have changed even had the relative fault rule been applied. Since Mulvaney was decided, I am unable to find a published case in which a federal court has chosen to apply a pro rata rule under Secs. 9, 18 or 10(b). Even the Second Circuit, where the pro rata rule had once been applied, appears to have altered its position in recent years. In Singer v. Olympia Brewing Co., 878 F.2d 596 (2d Cir.1989), that court did not adopt a pro rata judgment credit for nonsettlors in Sec. 10(b) actions as would have been the sensible course if it thought the contribution right a pro rata right; the court seemed to acknowledge, too, at least the possibility that "a plaintiff may be entitled to more damages from one defendant than from another...." Id. at 600
 
 
 [19]
 See J. Fischer, Contribution in 10b-5 Actions, 33 Bus.Law. 1821, 1829 (1978). After a detailed discussion of the English origins of the "as in cases of contract" language, Fischer concludes that Professor Ruder's thesis that the phrase requires application of a pro rata rule is in error and that "it appears that the phrase ... cannot be read too broadly. Indeed, its textual ambiguity and impreciseness makes its true application one of conjecture." 33 Bus.Law. at 1830
 
 
 [20]
 See Gould v. American-Hawaiian S.S. Co., 387 F.Supp. 163, 171 (D.Del.1974)
 
 
 [21]
 "Traditionally, equity has been the hallmark of contribution. The doctrine originated in courts of equity, and its rationale has not been altered by adoption in the common law. Jones v. Schramm, 436 F.2d 899 (D.C.Cir.1970); George's Radio, Inc. v. Capital Transit Co., 126 F.2d 219 (D.C.Cir.1942); 18 Am.Jur.2d Contribution Secs. 4 and 5. The governing principle of contribution throughout has been that one of two or more joint wrongdoers should not be required to pay more than his share of the burden, or to put it another way, that no obligor should be unjustly benefited at the expense of another." Id. at 170
 
 
 [22]
 It is worth noting, as well, that contribution is determined by reference to relative fault, not a strict pro rata rule, under other federal statutory schemes. See, e.g., Environmental Transp. Sys. v. Ensco, Inc., 969 F.2d 503 (7th Cir.1992) (holding that Congress intended courts to reference relative fault when assessing damages under CERCLA)